James E. PITTMAN, Jr. and Robert A. Bailey

v.

Terrell Don HUTTO, Richard A. Young and Sue L. Kennedy.

Civ. A. No. 78–0124–R.

United States District Court, E. D. Virginia, Richmond Division.

Feb. 24, 1978.

Michael S. Shelton, Richmond, Va., Stephen W. Bricker, ACLU, Richmond, Va., for plaintiffs.

J. Marshall Coleman, Atty. Gen. of Va., Burnett Miller, III, Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

The facts in this case were found from the bench on 14 February 1978 as modified and extended from the bench on 24 February 1978. Such findings of fact are incorporated hereto by reference to the transcript.

1. Mass mailings, much more akin to FYSK magazine, are specifically excluded from the opinion's view. Note 11, *Procunier v. Martinez* at 408, 94 S.Ct. 1800.

In *Procunier v. Martinez*, 416 U.S. 396, 408, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974) the Supreme Court observed that:

> For the most part, . . . courts have dealt with challenges to censorship of prison mail as involving broad questions of 'prisoners' rights.' This case is no exception. The District Court stated the issue in general terms as 'the applicability of First Amendment rights to prison inmates . . . ,' 354 F.Supp., at 1096, and the arguments of the parties reflect the assumption that the resolution of this case requires an assessment of the extent to which prisoners may claim First Amendment freedoms. In our view this inquiry is unnecessary. In determining the proper standard of review for prison restrictions on inmate correspondence, we have no occasion to consider the extent to which individual's right to free speech survives incarceration . . . . .

Though subsequent language in the opinion has been characterized as ambiguous in the implication of prisoners' First Amendment rights, this Court accepts that any ambiguity in *Martinez* must be resolved against a view that the opinion attempts to elucidate prisoners' rights under the First Amendment.

Even though dealing with the rights of non-inmates who send and receive occasional[1] personal letters, the Court held in Section D only that the prison authorities' decision to censor or withhold delivery of such letters is subject to "minimum procedural safeguards" to assure protection from "arbitrary governmental invasion." 416 U.S. at 417–18, 94 S.Ct. 1800. It follows that whether the burden be upon authorities to prove a questioned censorship non-arbitrary or whether the burden be upon the prisoner (or his correspondent) to prove the censorship arbitrary, a mere showing that the censorship was reasonable must obviate a claim that it was arbitrary.[2]

2. The Supreme Court also observed in *Martinez* that:

In contradistinction to *Procunier v. Martinez, supra, Pell v. Procunier,* 417 U.S. 817 [94 S.Ct. 2800, 41 L.Ed.2d 495] (1974) was explicitly a case involving the First Amendment rights of prisoners' access to newspapermen. The Court initially observed that:

In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law. 417 U.S. at 822, 94 S.Ct. at 2804.

In *Pell,* the Court delineated the "legitimate penal objectives" which must be assessed when challenged on prisoner's constitutional grounds as the deterrence of crime, the rehabilitation of the prisoner, and internal security.

After pointing out that there were a number of alternative means whereby prisoners could transmit newsworthy information to members of the press [3] the Court sanctioned restrictions upon access which operate, "in a neutral fashion, without regard to the content of the expression . . . ." 417 U.S. at 828, 94 S.Ct. at 2807. The restriction in question prohibited newsmen from conferring with specific inmates by restricting prison visitation to family, friends of prior acquaintance, legal counsel and clergy. The Court stated:

In the judgment of the State corrections officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compro-

mise institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, *in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations,* courts should ordinarily defer to their expert judgment in such matters. 417 U.S. at 827, 94 S.Ct. at 2806 (Emphasis added)

*Pell* was not a case in which the content of the communication with newsmen was involved. The restriction involved the manner of contact such that access must be through the mail or through legitimate visitors used as intermediaries. The discussion on page 827, 94 S.Ct. 2800 makes it clear that the authorities' restrictions upon First Amendment expressions under such circumstances are presumptively appropriate. Such restrictions should be overturned by the courts only upon a showing by "substantial evidence" that the officials have "exaggerated" their concern for legitimate penal objectives. In other words, even though First Amendment rights are involved, the burden is placed upon prisoners to show by substantial evidence that the view held by the prison authorities is not rationally held.

What *Pell* does not answer is the question of the burden of persuasion which must be met where prison officials attempt to censor First Amendment expressions because of their content. That is the issue which confronts the Court in this case. Under the facts found, the prison authorities sincerely believe that the content of certain articles in FYSK may adversely affect their ability to maintain internal security and effect rehabilitation in the prison. The Court has reviewed the issues put in evidence as well as the issue specifically suppressed. Though some of the articles are inflammatory and others are grossly insulting to

[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects nothing more than a healthy sense of realism. Moreover, where State penal institutions are involved, federal courts have a further reason for deference to the appropriate

prison authorities. *Procunier v. Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807.

3. In this case it is undisputed that prisoners at Virginia's maximum security prison may correspond with members of the press and that they have access to general circulation newspapers.

former prison officials, this Court is not satisfied that the distribution of the issue in question would cause unrest or lower prisoner morale, or reduce the prison authorities' ability to rehabilitate. At the same time, the Court accepts as genuinely held, and based upon substantial experience and expertise, the position taken by the prison authorities that distribution could have exactly those effects.

A case decided after *Martinez* and *Pell* but before *Jones v. North Carolina Prisoners' Labor Union, infra*, was *Blue v. Hogan*, 553 F.2d 960 (5th Cir. 1977). In *Blue*, the Fifth Circuit was attempting to apply *Martinez* principles to censorship of certain outside publications to which a prisoner subscribed on the grounds that the distribution was likely to have a "deleterious and detrimental effect on the inmate population at the institution." Thus, the basis for the censorship clearly was content. The magazine subscriptions in question went only to one prisoner as opposed to the mass circulation of FYSK. Despite the disclaimer contained in *Procunier v. Martinez*, as above noted, the Fifth Circuit held that the standard of *Martinez* clearly applied to the prisoner's rights implicated in their case. The Court's misgivings as to this holding were alluded to in a footnote:

> Arguably, prison officials may have more latitude in censoring periodicals. The Court in *Procunier v. Martinez* limited its holding to censorship of 'direct personal correspondence between inmates and those who have a particularized interest in communicating with them' and noted that '[d]ifferent considerations may come into play in the case of mass mailings.' Since appellant in the instant case has only argued that the *Procunier v. Martinez* standard should apply instead of the clear and present danger standard, we assume without deciding that *Procunier v. Martinez* does control censorship of magazines sent to inmates. (Citations omitted) 553 F.2d 960, 962, note 4.

In the case before this Court, the prison authorities do not concede that *Procunier v. Martinez* is controlling and instead maintain that they have the right to censor where they sincerely and rationally believe that distribution would have a deleterious and detrimental effect on the population with respect to internal security, morale, order and rehabilitation. Defendant prison officials maintain that such a judgment on their part should not be disturbed unless it can be shown that the position they take is irrational. The federal warden in *Blue v. Hogan* made no such claim. Nevertheless, the Fifth Circuit Court of Appeals interpreted *Procunier v. Martinez* in such a way as to very nearly approach the position taken by the officials in Virginia in this case.

The Fifth Circuit specifically held that in a prison setting the authorities have no burden to prove a compelling State interest or an imminent likelihood of danger. Though not clearly setting forth its determination as to what the rule should be the Fifth Circuit noted that the Supreme Court in *Martinez* defined the interests that must be furthered by censorship by use of such words as "important," "substantial," and "legitimate," and that the restriction is "generally necessary to protect" legitimate government interest. The Fifth Circuit further quoted the Supreme Court in *Martinez* as saying:

> Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. 553 F.2d at 963.

The Court turns to *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) for guidance in determining the reach of the First Amendment with respect to censorship of a mass circulation prisoner magazine or newspaper in a maximum security prison.

*Jones* is not a wholly satisfactory answer to the question presented. In the first place it does not deal with a prison newspaper. It does not address itself specifically to the dangers associated with all prisoners receiving the same point of view at the same time under the same conditions—the precise condition which exists with the mass circulation of an inmate newspaper. In ad-

dition, while *Jones* is clearly concerned with fundamental First Amendment rights, the manner in which the case was framed in the court below and hence the Supreme Court's discussion of the issues, deals to a substantial extent with Fourteenth Amendment rights which are irrelevant for purposes of the instant case. Nevertheless, what the Court *did* in *Jones* as well as what the Court said is highly instructive. Further, the holding in *Jones* as characterized by the dissent gives further insight into what was intended by the majority.[4]

The North Carolina prison officials were not merely concerned with the creation of yet another organization within the prison. Organizations such as the Jaycees and Alcoholics Anonymous as well as religious groups already existed. What they were concerned about was the objective or "content" of the particular organization which called itself the North Carolina Prisoners' Union. This is analogous to the instant case where the prison authorities are not objecting to the existence of the newspaper—they welcome it—they are only concerned with its objectives or content. The North Carolina officials were not neutrally concerned with advocacy in general; they were specifically concerned with the content of the proposals advocated by the union. This professed fear of the content of the union's advocacy was given weight by the Court though there was "not one scintilla of evidence to suggest that the Union has been utilized to disrupt the operation of the penal institutions." [433 U.S. at 127, 97 S.Ct. at 2539], 53 L.Ed.2d at 640, n. 5. Indeed, as with this Court's ambivalent view as to the disruptive effect of FYSK, the trial Court in *Jones* stated that, "on conflicting expert opinion evidence we are left with no firm conviction that an association of inmates is necessarily good or bad . . . ." This equipoise was specifically noted by the Supreme Court in its opinion in *Jones. Id.*

In *Jones* the Secretary of the Department of Corrections voiced some of the same fears alluded to by defendant Hutto here. He noted that if union leaders are, "recognized as spokesmen for all inmates, [they] make themselves to be powerful figures among the inmates." [433 U.S. at 127, 97 S.Ct. at 2539], 53 L.Ed.2d at 639. Defendant Hutto noted that the editors and publishers of a prison newspaper become power centers within the prison and that the existence of such power centers is fraught with danger.

The Supreme Court in *Jones* noted that there were alternative means of communication outside of a prisoner union. The same is, of course, true here. Even though the ready access of an inhouse newspaper be denied, prisoners can communicate via news media with the administration, with persons outside of the prison, and with their fellow inmates through permitted contacts with outside newspapermen.[5] As was noted in *Pell v. Procunier*, 417 U.S. 817, 824 [94 S.Ct. 2800, 2805, 41 L.Ed.2d 495]:

> [I]t is clear that the medium of written correspondence affords inmates an open and substantially unimpeded channel for communication with persons outside the prison, including representatives of the news media.

After considering the First Amendment impact upon bulk mail restrictions and inmate-to-inmate solicitation restrictions, the Court then turned to the most serious and most nearly analogous restriction on First Amendment rights—the restriction on the right to associate in a union. The Court said at [433 U.S. at 132, 97 S.Ct. at 2541], 53 L.Ed.2d 642–43:

> First Amendment associational rights, while perhaps more directly implicated by the regulatory prohibitions, likewise must give way to the reasonable considerations

**4.** The dissent, per Marshall, J., says: "In testing restrictions on the exercise of [First Amendment associational rights] the Court asks only whether the restrictions are 'rationally related to the . . . objectives of prison administration.' . . . and whether the rea-

sons offered in defense of the restrictions have been 'conclusively shown to be wrong' . . ." [433 U.S. at 140, 97 S.Ct. at 2546], 53 L.Ed.2d at 648

**5.** See note 3.

**66**

of penal management. As already noted, numerous associational rights are necessarily curtailed by the realities of confinement. They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interference with the legitimate penological objectives of the prison environment. As we noted in *Pell v. Procunier*, "central to all other correctional goals is the institutional consideration of internal security within the corrections facilities themselves."

Appellant prison officials concluded that the presence, perhaps even the objectives, of a prisoner's labor union would be detrimental to order and security in the prisons. It is enough to say that they have not been conclusively shown to be wrong in this view.

*Jones* holds that even though the concern of the prison officials be influenced by considerations of the objectives of a prisoners' union, it need only be shown that their concerns are reasonable in order for their reasonable prohibition on First Amendment associational rights to prevail. Indeed, it appears that those opposing the restriction must show the the prison officials must be "conclusively shown to be wrong" before the Court should intervene in the prison administration.[6] *Jones* is the latest voice of the Supreme Court on the question of prisoners' rights. Its holdings and its implications control here.

 The censorship system which has been shown to operate with respect to the FYSK has operated well for approximately five years. It can be assumed that the administration, the inmates, and the general public have benefitted from the carefully controlled publication of the newspaper. The censorship takes place not remotely from the editors and publishers but actually in their presence and through the process of negotiation and give and take. For the most part, the guidelines which determine censorship were proposed and advocated by the inmate editor, Mr. Pittman. There is no evidence that they are arbitrarily or unreasonably applied. Even matters of "good taste" are not out of place where rehabilitation is an objective. The controversy before the Court, on the human level, falls down to who shall be the final arbiter of newspaper content—the prisoner or the warden? *Jones v. North Carolina Prisoners' Union* tells us that so long as the warden is pursuing a rational means to further a legitimate penological objective, his is the last word.

An appropriate order shall issue.

---

6. In *Jones* the Court specifically quoted *Procunier v. Martinez* for the proposition that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."