594 F.2d 407
 James E. PITTMAN, Jr. and Robert A. Bailey, Appellants,
v.
Terrell Don HUTTO, Individually and in his official capacity
as Director of the Department of Corrections, and when
qualified, his successors and assigns, and Richard A. Young,
Individually and in his official capacity as Warden of the
Virginia State Penitentiary, and when qualified, his
successors and assigns, and Sue L. Kennedy, Individually and
in her official capacity as Assistant Superintendent of the
Virginia State Penitentiary, and when qualified, her
successors and assigns, Appellees.
 No. 78-1183.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1978.
Decided March 22, 1979.
 
 Stephen W. Bricker, Richmond, Va., American Civil Liberties Union of Virginia (Michael S. Shelton, Cohen, Abeloff & Staples, P. C., Richmond, Va., on brief), for appellants.
 Burnett Miller, III, Asst. Atty. Gen. (Marshall Coleman, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellees.
 Before WINTER, RUSSELL and WIDENER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Plaintiffs, who are inmates of the Virginia State Penitentiary and editors of a prison magazine distributed free to inmates and by paid subscription to others, sued under 42 U.S.C. § 1983 for declaratory and injunctive relief to redress the prison officials' denial of approval for publication of the November-December 1977 issue of the magazine. The district court denied relief, and we affirm.
 
 I.
 
 2
 FYSK (Facts You Should Know) Magazine is an inmate publication at the Virginia State Penitentiary in Richmond, Virginia, a maximum security institution. The publication began in 1973 as a result of discussions between inmates and prison authorities. Publication of FYSK is intended as a forum for inmate discussion and for communication between inmates and the staff of the penitentiary. The magazine is distributed without charge to inmates; persons not confined who wish to subscribe may do so at a cost of $5 per year. The magazine won national awards in the American penal press contest sponsored by the Southern Illinois University School of Journalism in 1974, 1976 and 1977. Since oral argument, we have been advised that FYSK has won similar awards in 1978.
 
 
 3
 The publication of FYSK has been financed by Virginia, and the magazine and its content have always been subject to review by prison authorities prior to publication and distribution. The defendant, Sue L. Kennedy, Assistant Superintendent of Treatment at the Virginia State Penitentiary, is the sponsor of FYSK Magazine and has the authority and duty of reviewing the magazine for content prior to its publication.
 
 
 4
 Prior to August 31, 1977, prepublication review was not pursuant to any written or published guidelines; but as a result of a meeting between inmate editors and prison officials held on August 31, 1977, certain guidelines, largely suggested by the inmate editors of FYSK, were adopted.[1]
 
 
 5
 At the trial of the instant case, there was substantial testimony to show that each of the criteria for prepublication review reflected important and substantial interests of Virginia. There was testimony that truthfulness was essential not only because the magazine was intended as a line of communication between inmates and staff, but also because the closed society of a maximum security institution was conducive to rumors and disturbance which ought not to be inflamed by false information. There was testimony that Virginia had an interest in maintaining the integrity and responsibility of the publication and that slanderous and defamatory material would be injurious to those innocently affected and subject the Commonwealth and the staff of the penitentiary to the exposure of litigation.
 
 
 6
 On December 21, 1977, the defendant Kennedy undertook an extensive review of the November-December 1977 issue with the inmate editor. Certain material in the issue was the subject of specific discussion. According to defendant Kennedy, she "questioned" that material, particularly with regard to whether the articles were factually correct, whether they were "out of line with good taste," and whether they were "fair" to the administration and might be "putting the magazine in jeopardy." According to the inmate editor, defendant Kennedy did more than "question" certain portions of the issue; she indicated that that issue could not be published unless those materials were deleted. In any event, there were no further discussions, that issue was not published, and this suit ensued. Plaintiffs seek a declaratory judgment and injunctive and other relief to restrain the defendants from prohibiting or preventing the distribution of the issue in question and enforcement of the guidelines for prepublication review.
 
 
 7
 After conducting an evidentiary hearing, the district court denied relief. It found that the articles which were the subject of discussion between defendant Kennedy and the inmate editor were definitely inflammatory and "those having the obligation of running prisons could be reasonably concerned. . . ." Additionally, the district court found that the process of review had not been completed by the defendants. Although the district court was not of the personal opinion that the magazine as a whole could cause dire consequences at the prison, it found that the prison authorities sincerely believed that distribution of the issue in question and others which offended the guidelines could be expected to create problems of morale, discipline, internal order, and security within the penitentiary. For reasons which we develop hereafter, we think that the district court also found that the concerns and sincere beliefs of the prison authorities were not unreasonable or totally lacking in foundation in fact.
 
 II.
 
 8
 While convicted prisoners do not retain the full panoply of constitutional rights normally enjoyed by those not convicted or incarcerated, their status as prisoners does not remove them entirely from the purview of the first amendment. A prison inmate retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Procunier v. Martinez,416 U.S. 396, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Pell v. Procunier,417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).
 
 
 9
 While the parties do not dispute the correctness of this basic proposition, they differ sharply about how it is to be applied in the instant case. Plaintiffs assert that Martinez teaches that the first amendment rights of the inmates and subscribers must prevail unless defendants prove that censorship or suspension of the disputed issue of FYSK furthers one or more of the substantial governmental interests of security, order and rehabilitation. This, they assert, was not proved; and, moreover, the guidelines for prepublication review fail to establish minimum procedural safeguards to insure that suppression of inmate expression is not too lightly sanctioned. Virginia, on the other hand, argues that Jones is the controlling authority, and that pursuant to it the sincerely-held belief of the Virginia prison authorities that the disputed issue of FYSK and others which would transgress the guidelines for prepublication review could cause security problems is sufficient justification for suppression of the issue and for validating the guidelines unless plaintiffs conclusively show that defendants' beliefs are unreasonable. The latter, defendants assert, plaintiffs have failed to prove. Additionally, defendants assert two related arguments: (1) that plaintiffs cannot assert the first amendment rights of subscribers to FYSK since this is not a class action and there is no non-inmate plaintiff, and (2) that plaintiffs divested themselves of standing to assert that they have been denied constitutional guarantees because they discontinued further negotiations as to what the disputed issue of FYSK might contain.
 
 
 10
 We are essentially in agreement with the contentions of the Commonwealth and not those of the plaintiffs. Martinez does hold that in order for prison officials validly to censor a prisoner's mail they must show that censorship furthers a substantial governmental interest of security, order or rehabilitation, unrelated to the suppression of expression, and, moreover, that the censorship is no broader than that reasonably required to further that interest. Martinez, however, dealt with a restriction on a prisoner's incoming and outgoing Personal mail; thus, more was involved than just the rights of the prisoners. Indeed, the Court was careful to note "(d)ifferent considerations may come into play in the case of mass mailings." 416 U.S. at 408 n.11, 94 S.Ct. at 1809.
 
 
 11
 The instant case involves more than the exercise of a prisoner to correspond with a person not incarcerated who, if the communication which he writes or which is addressed to him is censored, has rights which are affected. It is in effect a mass mailing. Of course, persons outside of the penitentiary may subscribe to FYSK, but we think that this case must be decided as if they were not concerned.[2] The primary purpose of FYSK is to be a forum for inmate discussion as well as a means of communication between inmates and the prison officials. The issues of FYSK sent to subscribers are identical to those circulated within the prison. Communication with those who have only an indirect interest in what transpires within the institution is only incidental. If non-prisoners have a greater right to the expression of views by an inmate or inmates, the latter can communicate with them by mail on an individual basis and thus bring themselves within the teaching of Martinez. See Pell v. Procunier, 417 U.S. at 824, 94 S.Ct. 2800; Jones v. North Carolina Prisoners' Union, 433 U.S. at 131 & n.8, 97 S.Ct. 2532.
 
 
 12
 We agree with the district court that Jones is the controlling authority. Jones involved prison regulations prohibiting inmates from soliciting other inmates to join a prisoners' union, barring meetings of such a union, and prohibiting the delivery of union publications mailed in bulk to several inmates for redistribution to other inmates. On a record which contained ample evidence that prison officials sincerely believed that the concept of a prison union was fraught with potential dangers and which lacked evidence that their beliefs were unreasonable, the validity of the prohibitions was upheld. Significantly for our purpose, the Court made clear that prison officials may limit first amendment rights, whether of speech or association, whenever they reasonably conclude that the exercise of such rights possesses the likelihood of disruption of prison order or stability or otherwise interferes with the penological objectives of the institution. 433 U.S. at 129-32, 97 S.Ct. 2532.
 
 
 13
 When we apply the principle of Jones to the district court's findings and examine the evidentiary support for those findings, we conclude that the district court's decision was correct. Twice in oral findings and a third time in its written memorandum, the district court found that defendants sincerely believe that the disputed issue of FYSK could be disruptive of prison order and security and the criteria of the guidelines for prepublication review are necessary to preserve prison order and security. Tr., Feb. 14, 1978, p. 143; Tr., Feb. 24, 1978, p. 4; 448 F.Supp. 61, 63-64 (D.C.Va.1978).
 
 
 14
 We think also that the district court found that the beliefs of the prison officials were not unreasonable. With regard to the latter, it is true that the district court indicated that, even though it found some articles to be inflammatory, it would not think the disputed issue of FYSK as a whole to be disruptive, but it recognized that it must judge the potentially disruptive effect in the light of expert knowledge and experience, which the court lacked, and that, so viewed, the issue could have that effect.[3] Whatever ambiguity there may be in the district court's express findings is dispelled by the closing paragraphs of its memorandum opinion. There the district court stated that Jones, which it correctly deemed the controlling authority:
 
 
 15
 holds that . . . it need only be shown that (prison officials') concerns are reasonable in order for their reasonable prohibition on First Amendment associational rights to prevail. Indeed, it appears that those opposing the restriction must show that the prison officials must be "conclusively shown to be wrong" before the Court should intervene in the prison administration. 441 F.Supp. at 66.
 
 
 16
 The district court added that "Jones . . . tells us that so long as the warden is pursuing a rational means to further a legitimate penological objective, his is the last word." Id.. Thus, we think the conclusion inescapable that the district court implicitly, if not explicitly, found that the beliefs of the warden were not unreasonable.
 
 III.
 
 17
 In view of the conclusions in Part II hereof, we do not find it necessary to discuss further the defenses of lack of standing and failure to exhaust administrative remedies. We need add only that the system for prepublication review and censoring of FYSK contains the minimum procedural safeguards required by Procunier v. Martinez, 416 U.S. at 417-19, 94 S.Ct. 1800. Under the system both before and after promulgation of the guidelines, Mrs. Kennedy examined each article that was questioned with the inmate editors, told them the basis of her objections, and afforded them an opportunity to revise and seek further review after the revision. They negotiate their differences. As the district court found, the system has worked well; "censorship takes place not remotely from the editors and publishers but actually in their presence and through the process of negotiation and give and take." 441 F.Supp at 66.
 
 
 18
 AFFIRMED.
 
 
 
 [1]
 These guidelines in their entirety are:
 PROCEDURES FOR THE FYSK
 The FYSK Magazine is to be published at six week intervals.
 The Magazine shall be no more than 24 numbered pages plus front and back covers.
 The front cover is to depict the major story inside the magazine and will be in "tasteful" style. Any use of individuals' pictures will require that person's concurrence.
 The FYSK is an information source with its content to be geared to the primary audience of the inmates at the Virginia State Penitentiary.
 The institution has an active interest in the content of this magazine, and an institutional staff advisor will be assigned to work with the FYSK staff.
 The Assistant Superintendent for Treatment has the responsibility for establishing procedures, policies, and management decisions pertaining to the publishing of this magazine. This includes monitoring content. The FYSK staff advisor is under the direct supervision of this Assistant Superintendent.
 The format of the FYSK is subject to joint desire of FYSK staff and FYSK staff advisor.
 There are to be no business advertisements in the FYSK. Subscriptions may be handled.
 Article deadlines will be set so that all persons desiring to input into the magazine will have these dates in advance.
 The content of the magazine is to be researched to ensure that every effort is made for the truth to be portrayed. The impact of the stories must be a consideration.
 Criteria for "Letters to the Editor" is to be established so that inmates can have an outlet for their personal opinion. Reasonableness is a necessity in this regard.
 Direct attack on individuals is not part of our policy.
 The FYSK is to be printed in the offset printing class with the coordination of the instructor.
 FYSK staff passes are to be handled on a need basis by FYSK staff advisor or the Assistant Superintendent for Treatment.
 FYSK staff will consist of three inmates.
 
 
 [2]
 Since this is a first amendment case, we would be inclined to hold that plaintiff inmates, even though a class action has not been certified, have standing to assert the first amendment rights of noninmate paid subscribers. See Procunier v. Martinez, 416 U.S. at 407-09, 94 S.Ct. 1800. But in disagreement with The Luparar v. Stoneman, 382 F.Supp. 495, 499 (D.Vt.1974), Appeal dismissed, 517 F.2d 1395 (2 Cir. 1975), a case relied upon by plaintiffs, we do not think that the fact that there is some distribution of FYSK to paid subscribers outside of the prison can limit the right of prison officials to censor the contents of the issues of FYSK which circulate within the prison
 
 
 [3]
 The Court has reviewed the issues put in evidence as well as the issue specifically suppressed. Though some of the articles are inflamatory (sic) and others are grossly insulting to former prison officials, this Court is not satisfied that the distribution of the issue in question would cause unrest or lower prisoner morale, or reduce the prison authorities' ability to rehabilitate. At the same time, the Court accepts as genuinely held, and based upon substantial experience and expertise, the position taken by the prison authorities that distribution could have exactly those effects. 441 F.Supp. at 63-64