[S.F. No. 24076. Dec. 10, 1982.]

ARTIE BAILEY et al., Plaintiffs and Respondents, v.
OTIS A. LOGGINS, as Superintendent, etc., et al.,
Defendants and Appellants.

908

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian and Jack R. Winkler, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, Ronald E. Niver, W. Eric Collins and Richard G. Tullis, Deputy Attorneys General, for Defendants and Appellants.

John H. Larson, County Counsel (Los Angeles), Richard K. Mason, Deputy County Counsel, and Ron Apperson as Amici Curiae on behalf of Defendants and Appellants.

Michael R. Snedeker and Smith, Snedeker & Comiskey for Plaintiffs and Respondents.

William J. Taylor, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

**BROUSSARD, J.**—Defendants appeal from a judgment mandating them, as officers of the Department of Corrections: (a) to permit publication of two articles in the Soledad prison newspaper, the Star News; (b) to formulate guidelines limiting administrative censorship of the Star News to matters which would reasonably be deemed a threat to institutional security or which described the making of a weapon or other dangerous device; and (c) to formulate regulations for expeditious review of controversies concerning inmate articles. Since defendants no longer object to publication of the articles in question, that portion of the controversy is moot. The principal questions before us concern the nature of the regulations and the adequacy of procedures for reviewing a decision barring publication of an article.

1. *History of this litigation.*

The Star News is an inmate newspaper written, edited and published at the state prison at Soledad. It is financed by the inmate welfare fund, not by the tax-

payers.[1] The trial court's findings described the publication: "A representative copy of the Star News Admitted into Evidence by stipulation as Exhibit A contained an editorial page, prepared by an inmate editor, a credit section by the Department of Corrections, and a 'disclaimer' section indicating that the views expressed in the paper do not reflect those of the Administration or other parties but are solely the expressions of the individual author-writer 'and should not be construed in any other manner.'" The court found a representative copy of the Star News to contain articles promoting the interests of different groups as well as material critical of prison administration.

In September of 1976 Willie Brandt, an inmate at Soledad, submitted two articles for publication in the Star News. One related to a lecture given at Soledad by Professor Amundson of the Institute of Industrial Relations at the University of California; the other concerned a lecture by Ms. Lytle, deputy legal affairs secretary to the Governor. Petitioner Bailey, inmate editor of the Star News, and Mr. Estin, the civilian journalism instructor, approved the articles for publication.

The Star News then submitted the articles to Associate Superintendent Dobreff, designated as supervisor of the content of the newspaper. He rejected the articles, as did the acting superintendent and his staff. Pursuant to the grievance procedures of the institution, editor Bailey filed an appeal from that decision requesting both that the authorities grant permission to publish the articles and that the Department of Corrections establish guidelines to govern the control of content of the newspaper.

Reviewers at the first and second level rejected Bailey's appeal. Finally, on February 1, 1977, respondent Enomoto, as Director of Corrections, sent a letter to editor Bailey explaining his ruling on the appeal, granting the request for guidelines, and adopting regulations 413.08, 413.10 and 413.11 of the department's administrative manual to govern publication of the Star News.[2] He then

---

[1]Revenues for the inmate welfare fund come from purchases at the prison canteen, purchases of handicraft materials, and extra charges on the sale of inmates' art works. (See *In re Van Geldern* (1971) 5 Cal.3d 832, 836 [97 Cal.Rptr. 698, 489 P.2d 578]; Pen. Code, § 5006.)

[2]The cited guidelines read as follows:

*Section 413.08: Standards*

"Publications should be written, illustrated and published as nearly in accord as possible with good journalistic standards.

"Publications should be so designed as to appeal so far as possible to all inmates. It shall not be devoted to the interests of a particular group. Great care should be taken to insure the accuracy of all information published. Great care should be taken to insure the *impartiality* and *good taste* of articles and illustrations published."

*Section 413.10: Prohibited Material*

"Every effort will scrupulously be made to avoid the publication of any material offensive to any race, nationality, religious faith, political party or other group of reputable citizens. No

denied the request for publication of the articles, citing the portion of regulation 413.11 which states that prison newspapers shall not "be used to . . . attack any law, rule or policy to which inmates or employees may object . . . Grievances . . . will be given consideration when called to attention through designated channels, and institutional publications shall not be used for that purpose." Apparently because the articles spoke favorably of collective organization and bargaining by the prisoners, the director concluded that they "constituted a subtle—or perhaps, not so subtle—attack upon administration" and thus violated regulation 413.11.

The guidelines adopted as department regulations provided generally that the newspaper should conform to good journalistic standards, be designed to appeal to all inmates, and avoid material offensive to racial, religious, or political groups. As noted in respondent Enomoto's letter, the guidelines prohibited the use of the newspaper to attack administration rules or policy, or to assert any grievance. They also banned the assumption of an editorial position on pending legislation, the attempt to elect or defeat any official, or an attack upon existing governmental policy.

On April 28, 1977, Bailey, as editor of the Star News, and the Prisoners Union, as a subscriber to that newspaper, brought the present mandamus action. During trial the Department of Corrections promulgated new and more complete regulations, published as regulations 720 through 726 of the department's administrative manual. The new provisions, in regulations 723 and 724, incorporated former regulations 413.08, 413.10, and 413.11 without change.[3]

---

obscene, lewd, pornographic, suggestive, libelous or defamatory matter shall be published."
 *Section 413.11: Misuse of Publication*
 "The columns of institutional publications shall be free from material seeking special favor with institutional, departmental, or state officials, and shall not be used to further the personal interest or ambitions of any inmate, employee or official. Neither shall the columns of such publication be used to promote special privileges for inmates or to attack any law, rule, or policy to which inmates or employees may object. Grievances will be given consideration when called to attention through designated channels, and institutional publicatons shall not be used for this purpose.
 "Institutional publications shall not take an editorial position on matters pending before the Legislature, nor urge the support or defeat of any legislation nor urge the election or defeat of any public official, nor attack existing governmental policy."

 [3]The regulations in effect at date of trial read as follows:
 "Sec. 720. *Policy.* (a) Institutions may publish a newspaper, magazine, or newsletter as specifically authorized by the warden or superintendent.
 "(b) Inmates may participate in the publishing and distribution of an institution publication when specifically approved to do so by the warden or superintendent.
 "(c) Institutional publications shall be edited and printed as part of the educational and vocational training programs of the institution where possible.
 "(d) Supervision of inmates preparing and publishing inmate newspaper is the responsibility of a civilian instructor in journalism or some other suitable person designated by the warden or superintendent. The person so designated will participate in the planning of each issue.
 "(e) Supervision of the content of the newspaper is the responsibility of a person at a super-

(Reference in this opinion to "regulations," unless otherwise identified, refers to those in effect at the time of trial.) After briefing and argument, the trial court concluded that the regulations in question were overbroad, and that regulations limiting the content of the newspaper were permissible only to protect institutional security. It then issued a peremptory writ mandating publication of the two articles and directing the enactment of regulations "which limit censorship of articles to publications of matters which if published would

visory or administrative level designated by the superintendent or warden and approved by the director.

"Sec. 721. *Purpose of Publication.* Each institutional publication shall be conducted in accordance with the following principles:

"(a) It shall have educational and training value for participating inmates.

"(b) It shall be an aid to the development of good morale among the inmates and their families.

"(c) It shall be used for the dissemination to the inmates of information from the administration.

"(d) It shall supply inmates with news happenings within the institution and the department.

"Sec. 722. *Expense and Circulation.* (a) The expense of publication must be met from inmate welfare funds.

"(b) Subscriptions outside of the institution may be accepted from individuals, agencies, or organizations engaged in activities related to prison work, or from individuals who have a particular interest in the field. Solicitation of subscriptions is prohibited.

"(c) Exchange or free circulation shall be limited to schools, libraries, proper state agencies, other prisons, or where it may be to the obvious advantage of the department or the institution. . . .

"(d) The exchange of inmate newspapers between institutions of the department is encouraged.

"Sec. 723. *Standards.* (a) Publications should be written, illustrated and published as nearly in accord as possible with good journalistic standards.

"(b) Publication should be so designed as to appeal so far as possible to all inmates. It shall not be devoted to the interests of a particular group. Great care should be taken to insure the accuracy of all information published. Great care shall be taken to insure the impartiality and good taste of articles and illustrations published.

"(c) No advertising material of a commercial nature shall be printed in an institutional publication.

"(d) Every effort will scrupulously be made to avoid the publication of any material offensive to any race, nationality, religious faith, political party or other group of reputable citizens. No obscene, lewd, pornographic, suggestive, libelous or defamatory matter shall be published.

"Sec. 724. *Misuse of Publication.* (a) The columns of institutional publications shall be free from material seeking special favor with institutional, departmental, or state officials, and shall not be used to further the personal interest or ambitions of any inmate, employee, or official. Neither shall the columns of such publication be used to promote special privileges for inmates or to attack any law, rule, or policy to which inmates or employees may object. Grievances will be given consideration when called to attention through designated channels, and institutional publications shall not be used for this purpose.

"(b) Institutional publications shall not take an editorial position on matters pending before the Legislature, nor urge the support or defeat of any legislation nor urge the election or defeat of any public official, nor attack existing governmental policy.

"Sec. 725. *Use of Names or Photographs.* (a) The use of the name or an identifiable photograph of an inmate in an inmate publication shall be at the discretion of the individual and the institution. . . .

"(b) In the event that institution policy permits the publication of such names, no such name shall be used if the inmate objects and no such picture shall be published without the approval in writing of the person involved. . . . "

reasonably be deemed a threat to the security of the institution . . . or which describes [*sic*] the making of any weapon, explosive, poison or destructive device." The trial court also found that the existing appeal procedure was inadequate,[4] and mandated enactment of regulations "ensuring expeditious review of censored articles for the prison newspaper."

Defendants appealed and secured a stay of the trial court's order. During the appeal, the Department of Corrections revoked the detailed guidelines of regulations 720 through 726, and adopted two regulations which simply provided generally for administrative control of prison publications.[5]

After the Court of Appeal affirmed the judgment, we granted a petition for hearing. While the case was pending here, the Department of Corrections adopted additional new regulations, again numbered as regulations 720 through 726 of its administrative manual. The new regulations closely resemble the previous regulations, bearing the same numbers, in effect at the date of trial.

With the passage of time, the controversy concerning publication of Willie Brandt's articles has abated. Defendants no longer object to publication. The remaining issues raised by this case—the power of the department to reject an article submitted for publication and the process of appealing that decision—are still issues of current controversy. The order of the trial court addresses those issues and requires the department to enact new regulations. Thus although the specific dispute concerning the two articles has dissipated, the question of the validity of the trial court's order is not moot but ripe for judicial resolution.

2: *Editorial control of the prison newspaper by the department.*

Penal Code sections 2600 and 2601 govern the rights of inmates in California prisons. Section 2600, the pertinent section in this case, provides that "[a] person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is con-

---

[4]The grievance procedure, described in *In re Muszalski* (1975) 52 Cal.App.3d 500, 506-507 [125 Cal.Rptr. 286], provides for three levels of appeal. Regulation 110 of the department's administrative manual provides that: "First level reviews must be processed and returned to the inmate/parolee within ten working days after receipt. . . . Second level reviews will be processed and returned to the inmate/parolee within 15 working days of receipt. [¶] If exceptional delays prevent closure within the specified time limits, the inmate/parolee will be informed in writing of the reasons for the delay and given an estimated completion date."

[5]The regulations promulgated April 26, 1978, and in effect when this case was decided by the Court of Appeal and first argued before this court, read as follows:
*3250. General Policy.* "Institutions may publish a newspaper, magazine, or newsletter as specifically authorized by the warden or superintendent."
*3251. Participation.* "Inmates may participate in the publishing and distribution of an institution publication when specifically approved to do so by the warden or superintendent."

fined and for the reasonable protection of the public." ■ Thus by statute California prisoners retain all rights encompassed under the heading of the freedom of the press in the First Amendment to the United States Constitution and article I, section 2 of the California Constitution, except to the extent that such rights must be curtailed for institutional security and public safety.

Consequently, established principles of constitutional law apply in defining the rights of prisoners. Among those principles is the rule that the state, having opened a forum for the expression of ideas, may not prevent members of its public from using the forum because the state disapproves of their beliefs or the content of their expression. (*Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982]; *Cox* v. *Louisiana* (1965) 379 U.S. 536, 557 [13 L.Ed.2d 471, 485-486, 85 S.Ct. 453].) Another is the doctrine that the state may not condition the exercise of a privilege, including the privilege of using state property, on the renunciation or nonexercise of constitutionally protected rights. *Danskin* v. *San Diego Unif. Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 257-258 [172 Cal.Rptr. 866, 625 P.2d 779].)

The application of these principles to a prison newspaper depends upon the purpose served by that publication, the governing regulations, and the practice of the prison authorities in applying those regulations. ■ It is clear, to begin with, that the prison need not establish any publication whatever. (*The Luparar* v. *Stoneman* (D.Vt. 1974) 382 F.Supp. 495.) It can give journalism classes without publishing or distributing the inmates' work. It could also use inmate labor to produce a "house organ" in which the only views expressed were those of the administration. Had it chosen any of these options, no constitutional issues would likely arise.

The department, however, chose to establish a newspaper which serves as a limited forum for prisoner expression. Understandably, the regulations emphasize the limitations, not the forum. The newspaper should serve the purpose of educating and training the inmate, disseminating information furnished by the administration, and informing inmates of events within the institution; it is designed only to "supply inmates with news happenings within the institution and department." (Reg. 721.) It should appeal to all inmates and not be devoted to the interests of one particular group. (Reg. 723.) It must conform to good journalistic standards—including accuracy, impartiality, good taste, avoidance of obscenity and defamatory matter. Commercial materials may not be published. Nor may the paper carry the name or identifiable photograph of a prisoner without that person's written approval. (Reg. 725.) The regulations further preclude material that is offensive to any race, nationality, religious faith, political party or other "group of reputable citizens." (Reg. 723.) To en-

force these limitations, the warden may designate a civilian journalism instructor or other outside person to be responsible for supervising inmates in preparing and publishing the paper and who is to participate in planning as well. Finally, the department seeks to retain ultimate control over the content of the paper through a supervisory or administrative employee appointed by the warden or superintendent. (Reg. 720, subds. (d) and (e).)

In spite of these restrictions, however, it is clear that an important communicative purpose is served by this institutional publication. The paper was and is freely circulated among the inmates and staff of the institution where published. In addition, subscriptions may be accepted from individuals, organizations or agencies "outside" which are involved in prison work or have a particular interest in the field. Prisoners' families are presumably included here, as one of the purposes of the publication is to develop their morale. Finally, the exchange of papers between institutions in the department is specifically encouraged by the department itself. (Reg. 772, subds. (b) and (c).)

The department's own regulations make it clear that the department contemplated that the institutional publication it authorized would include expressions of prisoners' ideas and views. Thus it saw fit to define and proscribe the kinds of ideas that would be improper. Contributors may not seek special favors from institutional or public officials; publications may not take an editorial position on pending legislative matters, current elections or attack governmental policy. Nor may the columns of the publication "be used to further the personal interest or ambitions of any inmate, employee, or official . . . [or] . . . to promote special privileges for inmates or to attack any law, rule, or policy to which inmates or employees may object." (Reg. 724.)

Department practice further demonstrates the expressive and communicative role of the Star News. The department has chosen to permit publication in a format which closely resembles an ordinary newspaper published outside prison walls and fully protected by the state and federal Constitutions. In applying its regulations, it has permitted numerous articles which express the views of the inmate authors. Although the trial court found that regulation 724, if broadly interpreted, "would prohibit *any* favorable or negative statement, express or implied, and almost any reference to any particular person, group, or idea" (italics in original), a representative copy of the Star News contained articles promoting the interests of a number of special groups, including articles entitled "Mormons," "Women's Quest for Rights Benefits All," and "Why Believe in God?" It is apparent that each of these articles expressed the views of its author and conceivably could have been excluded pursuant to a broad reading of regulation 724. The issue also contained a poem critical of the Adult Authority ("Doin a One to Ten with a Grin") and an article entitled "Warden's Opposition Sinks Plans for Con's Meet-Confer Rights," titles which might be

construed as attacks on institutional policy. The department made no objection to the content or inclusion of any of these articles.

The trial court further found the paper contained an editorial page prepared by the inmate editor, a credit section containing no indication that the department retained editorial control, and a disclaimer specifically stating that the views expressed in the paper are solely those of the individual authors. In sum, the factual findings of the court below support the conclusion that the department regulations permitted expression of inmates' views on topics falling within the approved purposes of the newspaper.

We therefore cannot accept defendants' attempts to characterize the Star News as a publication which does not fall within constitutionally protected expression. As we have seen, although "one primary purpose" of the publication is to teach inmates the skills of journalism and printing (reg. 721), the Star News is not merely a class assignment or a "practice" newspaper. It is distributed within and without the prison, and used by the administration and the inmates to communicate to the readers.

Neither can the publication be described as a "house organ." The current regulations offer a choice—the prison may "publish some form of newspaper or 'house organ'" (current reg. 720, subd. (a); see reg. 720), and scrutiny of the regulations and of the practice of the administration demonstrates that it has chosen the alternative of a limited-purpose newspaper.[6] The fact that the administration insists on a disclaimer asserting that the views expressed in the paper are not those of the administration but solely the expression of the inmate writer is particularly significant—a house organ is, by definition, a publication in which the views expressed are those of the administration, and not those of inmate writers.

The issue before us, consequently, is whether a prison newspaper intended to serve and serving as a limited forum for prisoner expression enjoys any protection under the First Amendment or correlative California provisions. Two federal decisions address the First Amendment issue directly. In *The Luparar* v. *Stoneman, supra,* 382 F.Supp. 495, the prison administration sought to restrict distribution of an inmate newspaper printed in the prison and partially

---

[6]We note that the same "house organ" argument presented in this case was raised by the school board to defend censorship of a high school newspaper in *Gambino* v. *Fairfax Cty. Sch. Bd.* (E.D.Va. 1977) 429 F.Supp. 731. The opinion states: "The defendants rely on the contention that The Farm News is not a public forum entitled to First Amendment protection. They argue that the newspaper is essentially an 'in-house' organ of the school system . . . [¶] While the state may have a particular proprietary interest in a publication that legitimately precludes it from being a vehicle for First Amendment expression, it may not foreclose constitutional scrutiny by mere labelling. [Citation.] Once a publication is determined to be in substance a free speech forum, constitutional protections attach and the state may restrict the content of that instrument only in accordance with First Amendment dictates." (P. 734.)

supported by state funds. Citing *Procunier* v. *Martinez* (1974) 416 U.S. 396 [40 L.Ed.2d 224, 94 S.Ct. 1800], the *Luparar* court ruled that prison regulations permitting censorship of prison newspapers "must be no broader than is necessary to protect the legitimate governmental interests of prison security, prison order and prisoner rehabilitation." (P. 501.) Rejecting the contention that state financial support of the paper permitted the state, as publisher, to exercise complete control over its contents, the court stated that "[t]he state is not required to establish or support an inmate newspaper, and once it does so, it can withdraw its approval or support for any reason, except those impermissible under the first amendment. However, once the state has allowed a newspaper to be established, the objection of prison officials, or those in the Department of Corrections, to its editorial content is not a permissible reason under the first amendment to prohibit its distribution." (P. 499.)

In *Pittman* v. *Hutto* (4th Cir. 1979) 594 F.2d 407, the Fourth Circuit considered the question of censorship of an inmate magazine, and held that "prison officials may limit first amendment rights, whether of speech or association, whenever they reasonably conclude that the exercise of such rights possesses the likelihood of disruption of prison order or stability or otherwise interferes with the penological objectives of the institution." (P. 411.) But although *Pittman* thus extends greater deference to administration judgments than did *The Luparar,* the two cases essentially agree that the administration cannot exercise arbitrary control; censorship can only be imposed to protect prison order and security, or to further some substantial state interest. (See Note, *The First Amendment Rights of Prison Newspaper Editors* (1979) 65 Va.L.Rev. 1485, 1488-1492.)

The cases do not support defendants' contention that because a "prison is most emphatically not a 'public forum'" (*Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119, 136 [53 L.Ed.2d 629, 645, 97 S.Ct. 2532]), prisoners enjoy no protected rights in connection with a prison newspaper. The quoted language from Jones is concerned with an asserted right of prisoners to convene meetings among themselves and with members of the public—a matter not at issue here. *Jones* did not involve a prison newspaper, and nothing in that opinion indicates that a newspaper cannot serve as a forum for prisoner expression. And although the cases which do involve prison newspapers differ on the extent of discretionary control granted the prison administration, all recognize that prison administrators do not have total and arbitrary power, but that First Amendment values appropriate to expressive forums enter into the balance. (See *Pittman* v. *Hutto, supra,* 594 F.2d 407, 411; *Gray* v. *Creamer* (3d Cir. 1972) 465 F.2d 179, 186; *The Luparar* v. *Stoneman, supra,* 382 F.Supp. 495, 499-501; *Payne* v. *Whitmore* (N.D.Cal. 1971) 325 F.Supp. 1191, 1193.)

We also reject the claim that the state as publisher enjoys the same total control over the content of the newspaper as a private publisher. (See *Miami*

*Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 255 [41 L.Ed.2d 730, 739-740, 94 S.Ct. 2831].) That contention overlooks the critical distinction between a government as publisher and a private publisher. (See Shiffrin, *Government Speech* (1980) 27 UCLA L.Rev. 565.) When identical claims based on the state's right as publisher have been asserted to justify censorship of high school and college newspapers, the courts have emphatically rejected those claims. A state university—and the same is true of the Department of Corrections—"is clearly an arm of the state and this fact will always distinguish it from the purely private publisher as far as censorship rights are concerned." (*Bazaar* v. *Fortune* (5th Cir. 1973) 476 F.2d 570, 574, affd. 489 F.2d 225; see also *Healy* v. *James* (1972) 408 U.S. 169, 187 [33 L.Ed.2d 266, 283, 92 S.Ct. 2338].)[7] The prison newspaper cases cited earlier reach the same conclusion: that the state, having established an activity which has the elements of free expression, must take account of First Amendment considerations in restricting that expression.[8]

In conclusion, departmental regulations and institutional practices have established an inmate newspaper which clearly does permit expression and communication of prisoners' views within the purview of the somewhat limited purpose for which the paper was established. Because both regulations and practice contemplate the paper will include expression of ideas, decisions to exclude particular articles which have been judged publishable by the editor must be scrutinized under the First Amendment.

▇▇ First Amendment values are implicated under two traditional theories. First, since the Star News functions as a public forum for the expression of ideas within the limited scope of the paper's purposes, the state may not in-

---

[7]Three federal district court decisions further develop this theme. In *American Civil Liberties Union of Va.* v. *Radford College* (W.D.Va. 1970) 315 F.Supp. 893, the court ruled that a state university cannot "support a campus newspaper and then try to restrict arbitrarily what it may publish, even if only to require that material be submitted to a faculty board to determine whether it complies with 'responsible freedom of the press.'" (Pp. 896-897.) In *Antonelli* v. *Hammond* (D.Mass. 1970) 308 F.Supp. 1329, the court observed that "[w]e are well beyond the belief that any manner of state regulation is permissible simply because it involves an activity which is part of the university structure and is financed with funds controlled by the administration." (P. 1337.) Finally, in *Gambino* v. *Fairfax Cty. Sch. Bd., supra,* 429 F.Supp. 731, the court rejected the argument that because high school students are less mature, the board as publisher of a high school newspaper had total control over its content. "While the scope of constitutional freedom may vary with the nature of the environment and the maturity of the individuals affected, the considerations governing the applicability of First Amendment analysis in the first instance does not change. Either the First Amendment is operative, or it is not. And if it is applicable, only then does the distinction between the extent to which speech is protected . . . become significant." (Pp. 734-735.)

[8]A prison, of course, is not a college campus. The penological objectives of the institution and the demands of insitutional security justify greater restrictions on prisoner speech than would be permissible in an educational institution. But when the state bases its argument not on considerations of institutional objectives and security, but on the claimed right of a publisher to control the content of anything it publishes, the distinction disappears.

fringe the right of free expression within the parameters of the forum. (See *Wirta* v. *Alameda-Contra Costa Transit Dist., supra,* 68 Cal.2d 51.) Under this analysis the department may censor newspapers in order to provide for the reasonable security of the institution and the reasonable protection of the public. (Pen. Code, § 2600; see *Procunier* v. *Martinez, supra,* 416 U.S. 396, 413 [40 L.Ed.2d 224, 230].) It may also exercise control over the content of the newspaper to serve valid penological objectives. (See *Procunier* v. *Martinez, supra,* 416 U.S. 396, 413 [40 L.Ed.2d 224, 240]; *Pittman* v. *Hutto, supra,* 594 F.2d 407, 412; Note, *op. cit. supra,* 65 Va.L.Rev. 1485, 1497.)[9] But it cannot do so merely because it disagrees with the views presented, objects to inmate criticism of administration policy, or seeks to avoid discussion of controversial issues. (*The Luparar* v. *Stoneman, supra,* 382 F.Supp. 495, 499; see *Procunier* v. *Martinez, supra,* 416 U.S. 396, 415 [40 L.Ed.2d 224, 241]; *Guajardo* v. *Estelle* (5th Cir. 1978) 580 F.2d 748, 761; *Joyner* v. *Whiting* (4th Cir. 1973) 477 F.2d 456, 460; *Pliscou* v. *Holtville Unified School Dist.* (S.D.Cal. 1976) 411 F.Supp. 842, 847; *Antonelli* v. *Hammond, supra,* 308 F.Supp. 1329; *Dickey* v. *Alabama State Board of Education* (M.D.Ala. 1967) 273 F.Supp. 613.) Thus, regulations should be drafted with sensitivity to First Amendment values, and with a view to avoiding restrictions unnecessary to any institutional or penological purposes.

Second, in applying and enforcing regulations, the department should act in a neutral, nonarbitrary, even-handed manner. Regulations such as sections 723 and 724 which permit the expression of opinion but at the same time permit exclusion of articles because the opinions expressed may be said to attack any privilege, rule, law or policy, or to further any personal interests, risk being applied in a manner which is not neutral with regard to elements of protected expression. (Cf. *Pell* v. *Procunier* (1974) 417 U.S. 817 at p. 828 [41 L.Ed.2d 495 at pp. 504-505, 94 S.Ct. 2800].) Indeed, these regulations resemble those struck down in *Procunier* v. *Martinez,* which provided such "extraordinary latitude for discretion" as to "fairly invite[] prison officials and employees to apply their own personal prejudices and opinions as standards for [] censorship [of prisoner correspondence]" and are susceptible of being applied to suppress unwelcome criticism. (416 U.S. at p. 415 [40 L.Ed.2d at p. 241].)

Since the regulations considered at trial are no longer in effect, and in the absence of any remaining controversy over publication of any particular article, it is not necessary to determine whether any past or current regulation is invalid facially or as applied. Instead, we need only emphasize to prison administrators

---

[9]Since one purpose of publication of the Star News is vocational training, the department can insist on standards of good journalism—that articles be grammatically correct, that reporters verify their stories, that editorial opinion be distinguished from factual reporting, etc. Another purpose is to present information of importance to the inmate community; thus, the department can also insist that the newspaper report announcements and events of interest to its readers.

that their regulations must be framed and applied uniformly with due regard for constitutionally protected rights of free expression, and in accord with the standards of *Procunier* v. *Martinez, supra,* 416 U.S. 396, and Penal Code section 2600. The department should be allowed to determine whether this can best be achieved by fashioning less restrictive or more precise regulations governing criteria for publication of articles.[10]

### 3. *Appeal of departmental decisions.*

Newspaper articles often must be published within a few days of the event they describe, or the articles will lose all value as reportage of current events; delay is often as effective a form of censorship as suppression of the article. ■■ Consequently, as the court explained in *The Luparar* v. *Stoneman, supra,* 382 F.Supp. 495, 502, "[t]he prison administration must . . . ensure an expeditious review procedure. To be valid, the regulations must prescribe a definite brief time within which the review of submitted material will be completed."

Both the appeals procedure in effect at the time of the rejection of the Brandt articles, and the modified procedure in effect now, provide for three levels of appeal, and permit a period of 45 days between the initial grievance and the final decision (with additional time for extraordinary cases). Neither set of regulations distinguishes cases involving rejection of newsworthy articles from other prison grievances. We therefore agree with the trial court that the prison grievance and appeals procedure is not one suitable for occasions when timeliness and First Amendment considerations are implicated, and that the department should enact rules providing for immediate review.

### 4. *Conclusion.*

The department regulations and practices evidence an intention to allow publication of a prison newspaper which serves several purposes: aiding the education and morale of the prisoners; providing information from the ad-

---

[10]Three provisions in current regulation 723 warrant reconsideration. Subdivision (a) provides in part that "[n]o material will be published which could . . . subject the institution, as publisher, to public censure or disrepute." Subdivision (b) provides that "[r]eports and articles will not . . . serve as a vehicle for grievances or complaints . . . " Finally, subdivision (f) provides that "[i]nstitutional publications shall not take positions on matters pending before the Legislature, or urge the support or defeat of any public official."

The right to criticize government administration, and to take positions on current political controversies, lies at the core of the First Amendment. Accordingly, the department should reconsider whether the quoted regulations are in fact necessary to promote institutional security or to further some other legitimate interest, and whether some less restrictive regulation would suffice. We are confident that in revising and applying its regulations, the department will follow the guidelines set forth in this opinion.

ministration and on events within the institution; and providing a limited forum in which prisoners can express their views and opinions on matters affecting them. ■ Consequently, although the department retains greater powers to regulate and censor then would be appropriate outside the prison walls, it does not have total or arbitrary power, but must exercise its authority even-handedly and, with sensitivity to the values protected by the First Amendment and corresponding California constitutional and statutory provisions.

We emphasize that the department may regulate the content of the newspaper, and may ban the publication of particular articles, if it perceives a threat to institutional security. The department may also assert its authority to achieve other legitimate penological objectives, such as vocational training of the person working on the paper and the publication of news important to the inmate community. And in all such matters, the courts give deference to determinations by prison officials that restrictions are essential to protect a legitimate state interest. (*Pell* v. *Procunier, supra,* 417 U.S. 817, 827 [41 L.Ed.2d 495, 504]; *Jones* v. *North Carolina Prisoners Union, supra,* 433 U.S. 119, 126 [53 L.Ed.2d 629, 638-639].)

In deference to the responsibilities and authority of the department, we reverse the order of the trial court mandating the enactment of new regulations limited to protection of institutional security. In the absence of any remaining controversy over the publication of any specific articles, we think it sufficient to explain to the department that in the drafting and enforcement of regulations governing the content of the newspaper it should act in a consistent and even-handed manner, and with due regard for the First Amendment values.

We agree, however, with the trial court that the present regulations are deficient in failing to provide a speedy method of appealing and reviewing a department decision barring publication of an article. Because articles may cease to be newsworthy in a short period of time, expeditious review is essential, and the regulations should be revised to provide such review.

The portion of the order of the superior court directing publication of the two articles at issue, and requiring the department to enact administrative regulations ensuring expeditious review of administrative decisions barring publication of particular articles, is affirmed. The portion of the order directing enactment of new administrative regulations which would permit censorship only of articles which could reasonably be deemed a threat to the security of the institution or which describe the making of a weapon, explosive, poison, or destructive device, is reversed. Each party shall bear its own costs on appeal.

Reynoso, J., concurred.

**NEWMAN, J.,** Concurring.—**(1b), (2b), (3c), (4b)** I read the lead opinion as holding that, except when necessary to provide for reasonable security or reasonable public protection, the Department of Corrections no longer may concretize clauses like those of regulation 723 that are identified in footnote 10 of the opinion. Therefore I concur.

I would, though, rely not on the First Amendment of the federal Constitution but on sections 2, subdivision (a) and 3 of article I of the California Constitution. (See *In re Reynolds* (1979) 25 Cal.3d 131 [157 Cal.Rptr. 892, 599 P.2d 86]; *In re Brandt* (1979) 25 Cal.3d 136 [157 Cal.Rptr. 894, 599 P.2d 89]; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341].)

Further, I do not agree that Penal Code section 2600 permits any restraints or abridgments of speech, press, and petition rights that can be justified only by referring to "good" journalistic standards or "valid" penological objectives. In my view the Legislature has required that those standards and objectives be based on either security or public protection.

**BIRD, C. J.,** Concurring.—**(1c), (2c), (3d), (4c)** I write separately to emphasize two points. While the majority opinion, with which I concur, refrains from formally striking down any particular existing regulation, the department may not reissue regulations substantially similar to those which have been presented to this court. As the majority opinion makes clear, the regulations issued hereafter must comport with the First Amendment principles applicable to state publications generally (except as provided by Pen. Code, § 2600).

**RICHARDSON, J.**—I respectfully dissent.

The majority substantially restricts the right of the Department of Corrections to regulate the content of inmate articles submitted for publication in a prison newspaper. In my view, inmates have neither a constitutional nor statutory right to publish their articles in such a newspaper. Accordingly, prison authorities should have *broad* discretion to select among, and edit or reject, those articles submitted for publication without later being required to justify their actions on institutional, social or penological grounds. Nor would I require the department to formulate elaborate review procedures directed at second-guessing prison officials' discretionary decisions on publication matters.

The editing and printing of the Star News is conducted as part of the institution's vocational and educational program, and inmates prepare and edit the newspaper, supervised by a civilian journalism instructor. The regulation of the

content of the newspaper is the responsibility of a prison staff member who is vested with "full authority to select, edit or reject submitted articles . . . ."

According to the department's administrative manual, the purposes of publishing Star News are to educate and train participating inmates, develop good morale among inmates and their families, disseminate administrative information to inmates, and report activities within the institution and department.

Present regulations permit the publication of a newspaper upon authorization of the warden or superintendent, and further allow inmate staff participation if specifically approved by the warden or superintendent. Current regulations also provide that the warden shall designate a civilian employee as supervising editor to manage planning and publication, that such employee shall be responsible for content, that no material shall be published "which could threaten prison security or order or interfere with program objectives or subject the institution, as publisher, to public censure or disrepute," and that articles shall not attack any individual, serve as a vehicle for grievances or complaints, promote personal opinions, take positions on matters pending before the Legislature, or urge support or defeat of any public official. The regulations further exclude obscene, pornographic, and defamatory matter and materials offensive to any race, nationality, religious faith, or similar group. Provision is also made for inmate appeal of the decisions of the supervising editor.

The majority holds that the department's regulations are overbroad and grant powers of censorship which invade the constitutional and statutory rights of prison inmates. As will appear, I believe that the department acted properly both in vesting prison officials with ultimate control over the content of inmate's articles, and in promulgating the regulations at issue.

The majority relies primarily upon cases holding that once a governmental entity establishes a public forum for the expression of ideas, it cannot selectively ban those expressions of which it disapproves. (E.g., *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51, 55 [64 Cal.Rptr. 430, 434 P.2d 982]; *Bazaar* v. *Fortune* (5th Cir. 1973) 476 F.2d 570, affd. 489 F.2d 225.) The underlying flaw in this argument is that a "prison is most emphatically not a 'public forum' " (*Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119, 136 [53 L.Ed.2d 629, 645, 97 S.Ct. 2532]) and, as the department's regulations make clear, the Star News was never intended as a marketplace for the free expression of ideas, but primarily as a "house organ" to be edited and printed "*as part of the educational and vocational training programs . . .*" of the institution. (Italics added.) The civilian instructor, supervising the preparation and publishing of the paper, "will participate in the planning of each issue." The content of the paper "is the responsibility of the designated super-

vising employee" who has full authority to select, edit or reject submissions. The primary purpose of the publication is its "educational and training value for participating inmates." Although it may also be used for the dissemination of information from the administration and of happenings within the institution, the publication "shall not be designed to cover events and issues outside of the institution . . . ."

Given the limited purpose of the Star News, the bus advertising, school newspaper and other First Amendment cases cited by the majority are wholly inapposite. Moreover, none of these cases involves governmental limitations upon the expression of ideas *by prisoners*. A restricted prison setting is a very unique environment. Large numbers of prisoners, closely confined, generate discipline problems with potential for violence. Prisons can be very dangerous areas, and in my view those charged with prison administration must have broad discretion to administer prison affairs and to select among, and edit or reject, those articles submitted for publication in a prison newspaper.

An analogous situation arose in *Jones* v. *North Carolina Prisoners' Union, supra*, 433 U.S. 119, where prison officials forbade the formation of a prisoners' union on the ground that it might create a divisive and potentially disruptive element within the inmate population. Plaintiff union insisted that the denial of union privileges for prisoners was an unreasonable abridgment of their constitutional rights. The high court unequivocally ruled that *the union had the burden of proving the unreasonableness of the prison authorities' concerns regarding the potential dangers of a prisoners' union. The Supreme Court stated: "Without a showing that these beliefs were unreasonable, it was error for the District Court to conclude that appellants [prison officials] needed to show more. In particular, the burden was not on appellants to show affirmatively that the Union would be 'detrimental to proper penological objectives' or would constitute a 'present danger to security and order.' . . . Rather, '[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, *courts should ordinarily defer to their expert judgment in such matters.'* Pell* v. *Procunier* [1974] 417 U.S., at [p.] 827. *The necessary and correct result of our deference to the informed discretion of prison administrators permits them, and not the courts, to make the difficult judgments concerning institutional operations in situations such as this."* (Pp. 127-128 [53 L.Ed.2d p. 640], italics added; see also *Bell* v. *Wolfish* (1979) 441 U.S. 520, 547-548 [60 L.Ed.2d, 447, 474, 99 S.Ct. 1861]; *In re Price* (1979) 25 Cal.3d 448, 453 [158 Cal.Rptr. 873, 600 P.2d 1330].)

The same due deference to the responsible prison administrators which was mandated by *Jones, supra*, 433 U.S. 119, should be extended to officials who,

as here, select the contents of a prison newspaper. Given the highly volatile and unpredictable environment existing behind prison walls, and the complexity of balancing rehabilitative efforts with overall prison security and discipline, the scope of discretion vested in prison officials must include the right to edit or refuse to publish *any* articles which prison officials in the fair exercise of their professional judgment reasonably deem potentially disruptive, provocative or inflammatory. Within this context, I observe a marked distinction between a free society and prison environment. Open criticism may, indeed should, properly flourish in the former. In a prison setting, however, with its potential for violent overreactions to the printed word, closer control over published expression seems clearly warranted.

The majority suggests that freedom from censorship is among those rights protected by Penal Code section 2600. By its terms, section 2600 allows prison authorities to deprive inmates "of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution . . . and for the reasonable protection of the public." Significantly, however, the section does not purport to create *new rights,* but only to preserve *preexisting ones.* It bears emphasis that prior to their confinement, inmates as law-abiding private citizens enjoyed no right of publication on demand, or freedom from editorial censorship. Rather, whether in public or private publications, private citizens are required to meet whatever publication or editorial standards are demanded of them. The Supreme Court has reminded us that "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." (*Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 258 [41 L.Ed.2d 730, 741, 94 S.Ct. 2831]; see *Pell* v. *Procunier* (1974) 417 U.S. 817, 821-822 [41 L.Ed.2d 495, 501, 94 S.Ct. 2800] and cases cited.) A private citizen's letter to the editor may or may not be published. His submitted articles or comments may or may not be accepted. I cannot fairly conclude that a person's constitutional rights are *enlarged* by the sole fact of his felony conviction or confinement in prison. By what strained reasoning do a citizen's First Amendment rights become greater inside than outside prison walls?

Moreover, there are reasonably adequate alternative means of communication available to the inmate. If he seeks to disseminate his views and opinions among his fellow inmates, he may express them orally in the prison yard, dining hall or workshop. If his eye is on the larger audience outside the prison, he can write or express his views through personal visits with his family, the clergy, attorneys, or friends. (See *Pell, supra,* 417 U.S. at pp. 824-825 [41 L.Ed.2d at pp. 502-503].)

Nor is section 2601 of the Penal Code apposite here. That section confers upon prisoners the right to "purchase, receive, read . . . newspapers . . . accepted for distribution by the United States Post Office, except those which describe the making of any weapon . . . ." (Subd. (c).) It confers no right of publication. It simply preserves an inmate's preexisting right to obtain and read newspapers received from outside prison walls.

None of the prisoners' rights cases relied upon by the majority is dispositive of the issue before us. *Procunier* v. *Martinez* (1974) 416 U.S. 396 [40 L.Ed.2d 224, 94 S.Ct. 1800], merely upheld the right of "civilians" to correspond by mail with prisoners without undue censorship. The issue of the *inmates'* rights to receive mail was neither examined nor resolved. *The Luparar* v. *Stoneman* (D.Vt. 1974) 382 F.Supp. 495 (app. dism. (2d Cir. 1975) 517 F.2d 1395), involved a prison's attempt to suppress by *a total ban* the publication of an inmate newspaper because of the inclusion of various articles to which prison officials objected. Although such total suppression was deemed excessive, the *Luparar* court acknowledged that prison authorities had broad discretion to regulate the content of an inmate newspaper. (P. 501.) *Pittman* v. *Hutto* (4th Cir. 1979) 594 F.2d 407, *upheld* the censorship of a prison magazine based upon the reasonable penological concerns of prison officials. The court did not purport to place on these officials the burden of establishing the legitimacy of these concerns.

Finally, *Pell* v. *Procunier, supra,* 417 U.S. 817, *upheld* prison restrictions on face-to-face interviews between inmates and the press. In resolving this issue, the high court focused upon the particular rights which were alleged to have been affected. The court observed that although inmates may have had a preexisting "free speech" right to "communicate [their] views to any willing listener, including a willing representative of the press for the purpose of publication by a willing publisher" (p. 822 [41 L.Ed.2d 495, 501]), considerations of prison security justify reasonable restrictions on such interviews. Very significantly for our purposes, the high court further emphasized that "the constitutional right of free speech has never been thought to embrace a right to require a journalist or any other citizen to listen to a person's views, *let alone a right to require a publisher to publish those views in his newspaper* [citations] . . . ." (Pp. 821-822 [41 L.Ed.2d, p. 501], italics added.)

A prison newspaper may serve many valid and diverse purposes such as educating inmates, promoting prison morale, encouraging rehabilitation, lessening tensions, improving inmate-guard relations, recognizing literary merit, and providing a balanced reading diet. But the determination of the goals to be served and the means for implementing them is a matter which should be entrusted to the sound discretion of the prison administrators.

I would reverse the judgment.

Mosk, J., concurred.

**KAUS, J.**—I dissent separately—and very briefly—because I approach the problem from a slightly different angle than does Justice Richardson's dissent.

I might mention at the outset that the practical effect of the majority decision is likely to be nil. There is obviously enough leeway in the court's criteria —threat to the security of the institution and proper penological purposes—to enable a sophisticated prison administration to regulate the content of a prison newspaper pretty much as it wants, provided it is done in slightly less ham-handed[1] fashion than heretofore.

That problem aside, it seems to me that the majority starts from an erroneous premise: That in permitting a "newspaper" to be published the current Department of Correction's regulations create a "forum for the expression of ideas." Once that proposition is accepted, the balance of the court's opinion follows along well-established First Amendment paths from which I would be the last to stray.

I believe, however, that the premise is wrong. A look at the department's administrative manual convinces me that the current regulations do not intend that "prison newspapers" serve the lofty purpose assumed by the majority.[2] Herewith a fair summary of the currently applicable regulations: Inmates may participate in the publishing and distributing of "some form of newspaper" or

---

[1] E.g.: "No material will be published which could . . . subject the institution, as publisher, to public censure or disrepute." (Dept. of Corrections, Admin. Man., § 723, subd. (a).)

[2] Although—as the majority suggest—the current regulations "resemble" the regulations which were in effect at the time of trial, there are a number of potentially significant differences. First, while the former regulations provided that "[i]nstitutions may publish a newspaper, magazine or newsletter as specifically authorized by the warden or superintendent" (former § 720, subd. (a)), the current section provides that "[i]nstitutions may publish *some form of newspaper or 'house organ,'* with the specific authorization of the warden or superintendent." (Italics added.) (§ 720, subd. (a).) Second, unlike the prior regulations, the current provisions state that "[i]nstitution publications shall not be designed to cover events and issues outside of the institution and department, except for items directly related to departmental operations." (§ 721, subd. (d).) Third, whereas the former regulation stipulated that publications were to be financed from inmate welfare funds (former § 722, subd. (a)), the current section provides that publications shall be financed out of the general operating expenses of the institution. (§ 722, subd. (a).) Finally, the current provision on publication standards (§ 723, quoted at fn. 3, *post*) appears to place greater limits on publications than those imposed by former sections 723 and 724 (quoted by the majority at p. 912, fn. 3, *ante*).

In my view, the current regulations, rather than the regulations that were in effect at the time of trial, provide the appropriate basis for review. As this court explained in an analogous situation in *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 306, footnote 6 [138 Cal.Rptr. 53, 562 P.2d 1302]: "Under settled principles, the version of the [regulation] in force at present is the relevant legislation for purposes of this appeal."

"house organ" (§ 720, subd. (a)), which shall be edited and printed "*as part of the educational and vocational training programs . . .*" (§ 720, subd. (c)). (My italics.) A civilian instructor is to supervise the preparation and publishing of the paper and that particular employee "will participate in the planning of each issue." (§ 720, subd. (d).) The content of the paper "is the responsibility of the designated supervising employee" who has full authority to select, edit or reject submissions, (§ 720 subd. (e).) The primary purpose of the publication is its "educational and training value for participating inmates." (§ 721, subd. (a).) It may also be used for the dissemination of information from the administration and of happenings within the institution. (§ 721, subds. (b), (c).) In fact, the publication "shall not be designed to cover events and issues outside of the institution . . . ." (§ 721, subd. (d).) Then, after a section dealing with circulation, come the provisions relating to "standards" (§ 723)—the main target of plaintiff's attack in this proceeding.[3]

I readily concede that these standards would be outrageous were they imposed to restrict the rights of a hypothetical private newspaper publisher. I further concede that even if one subtracts from those rights the restrictions permitted by section 2600 of the Penal Code, these standards are overbroad. My point is, rather, that the hypothetical newspaper issued by our hypothetical publisher is generically different from the type of publication which the administrative manual has in mind. What the majority has done, in effect, is to tell defendants first, what type of publication they ought to permit and, second, that they are not doing it right.

The majority's concept of the type of paper which defendants are to allow presumably conforms to some platonic ideal of a newspaper the very contemplation of which evokes First Amendment magic—Peter Zenger, *Near* v. *Minnesota, New York Times* v. *Sullivan, The Pentagon Papers* case, *Nebraska Press Association* v. *Stewart,* and so on. If defendants purported to authorize publication of that kind of a newspaper, the First Amendment consequences which the majority visits on them would, of course, be justified.

---

[3]Section 723 currently provides: "*Standards.* (a) Publications should be written, illustrated and published in accord with good journalistic standards. No material will be published which could threaten prison security and order or interfere with program objectives or subject the institution, as publisher, to public censure or disrepute. [¶] (b) Institution publications will be expected to adhere to the highest standards of accuracy and objectivity. Reports and articles will not make attacks on any individual, serve as a vehicle for grievances or complaints or as a substitute for the departmental appeal process, or promote personal opinions. [¶] (c) No advertising material of a commercial nature shall be printed. [¶] (d) Material offensive to any race, nationality, religious faith or similar group will not be published. [¶] (e) No obscene, lewd, pornographic, suggestive, libelous or defamatory matter shall be published. [¶] (f) Institutional publications shall not take positions on matters pending before the Legislature, nor urge the support or defeat of any public official."

The point is, however, that the current regulations do no such thing. They permit a house organ, as part of the inmates' educational and vocational training program, run under the supervision of a civilian instructor with full authority to select, edit and reject submissions. They specifically provide that the paper is not to cover events outside the institution, but can only disseminate intrainstitutional news. In other words, they permit an intramural, educational training exercise, designed primarily to aid in the inmates' rehabilitation—a pedagogical effort to which the First Amendment is as relevant as the Clayton Act to a game of Monopoly.

Two analogies may clarify my point. First: suppose that as part of a prison course in writing the instructor had asked the students to write an essay on "Why My Trial Counsel Was Incompetent." Suppose further that an inmate refused to write on that subject, but handed in an essay on "The Concept of Peace in Early Celtic Literature." Would anyone doubt that the instructor could take appropriate action to try and make the student conform to the demands of the course? The student's mission was to write within the confines of a theme prescribed by the instructor and he failed to do so. Surely he cannot appeal to "free speech" or cry "censorship" to avoid a failing grade. To me the prison paper is no different: its mission is to educate, to rehabilitate and to inform within clearly designated limitations. It is not intended as a "forum for the expression of ideas."

Second: try a variation on the theme of *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885]. Suppose the school in question had made its auditorium available for the limited purpose of holding a debate tournament. Can it be doubted that it could constitutionally condition the license on the contestants' being required to stick to the resolutions being debated and getting the hook if they wander all over the lot to express their political views to a captive audience?

Admittedly neither of these two analogies is perfect. The reason, I suspect, is that the type of prison newspaper permitted by the department is *sui generis* and simply will not fit into the standard First Amendment mold.

I also admit the obvious: reasonable persons can differ on the threshold question whether the paper is established as an educational-rehabilitative exercise or as a marketplace for ideas. I would respectfully urge that in straining to find the latter to be the case, the majority is not likely to further First Amendment values. It is recognized that the department is under no compulsion to permit the publication of newspapers within our prisons. It has, however, made a stab in that direction but, for its pains, has been subjected to a rolling barrage of First Amendment artillery. If the department can live with the guidelines pro-

mulgated in this opinion—as I have suggested at the outset it can—no harm will be done. On the other hand, if it finds the guidelines intolerable, it will simply have to discontinue a worthwhile educational and vocational training program.