[No. A023454. First Dist., Div. Four. Aug. 24, 1984.]

In re CHARLES WILLIAMS on Habeas Corpus.

## Counsel

Donald Specter, under appointment by the Court of Appeal, Michael Satris, Charles S. Bishop and Constance Bakkerud for Petitioner.

William S. Boyd, William J. Taylor, Brobeck, Phleger & Harrison, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Petitioner.

John K. Van de Kamp, Attorney General, Thomas A. Brady, Richard G. Tullis and Ronald E. Niver, Deputy Attorneys General, for Respondent.

## Opinion

HAUGNER, J.*—Charles (EZ) Williams, editor of the San Quentin News, by petition for writ of habeas corpus challenges the regulations which have been promulgated on the subject of inmate publications by the Department of Corrections.

The San Quentin News is a newspaper published by the prisoners of San Quentin. The paper is distributed free to all prisoners and visitors to the prison. Paid subscribers include family and friends of prisoners, public interest groups, and members of the press.

Petitioner is the inmate editor of the San Quentin News. He filed a petition for writ of habeas corpus in Marin County Superior Court contending that

*Assigned by the Chairperson of the Judicial Council.

the guidelines of the Department of Corrections for the publication of inmate newspapers are constitutionally invalid on their face. On June 22, 1983, the superior court rejected all but three of the challenges to the regulations. On July 21, 1983, petitioner filed the instant petition for writ of habeas corpus. Opposition was filed by the Attorney General and an amicus brief in support of petition was filed by the American Civil Liberties Union Foundation of Northern California, Inc. The petition was denied.

Petitioner thereupon filed a petition for hearing in the Supreme Court. On February 29, 1984, the Supreme Court filed an order reading: "The California Department of Corrections is ordered to show cause before the Court of Appeal, First Appellate District, Division Four, when the matter is ordered on calendar, how its administrative guidelines governing prison newspapers conform to the standards set forth in *Bailey* v. *Loggins* (1982) 32 Cal.3d 907 [187 Cal.Rptr. 575, 654 P.2d 758]. (See *Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486, 487 [14 L.Ed.2d 22, 28, 855 S.Ct. 1116]; *People* v. *Fogelson* (1978) 21 Cal.3d 158, 163-164 [145 Cal.Rptr. 542, 577 P.2d 677].)"

The return to the order to show cause was filed and incorporated by reference the opposition to the petition. A traverse and exception to return was filed.

The regulations challenged in this petition were issued on January 13, 1983, following the decision of *Bailey* v. *Loggins, supra,* 32 Cal.3d 907, in which the Supreme Court discussed the scope of regulations which could be enacted to censor inmate publications. They are published as sections 720 through 728 of the administrative manual of the Department of Corrections.

The regulations state that institutions may publish a newspaper. The limited scope of the paper's purposes is determined by section 721: "Section 721. *Purposes.* Each publication shall serve these purposes: [¶] (a) As a primary purpose, the publication shall provide a useful and constructive service in institution operations by disseminating relevant information of interest to inmates and staff about institutional events and activities, policies and procedures, law changes, and court decisions, plus other pertinent and useful information. [¶] (b) It shall provide work experience and training in journalism, printing and related fields." The staff in such a publication is composed of inmates supervised by a department employee appointed by the warden or superintendent. (§ 722, subd. (a).) This supervising editor selects the staff and evaluates their performance (§ 722, subds. (c), (d)) and is responsible for the content of the publication. (§ 722, subd. (d); § 724, subd. (a).) Pursuant to this latter responsibility, the supervising editor has

"authority, as in the case of editors for outside publications, to select, edit, or reject articles, illustrations and layouts." (§ 722, subd. (d).) When the supervising editor and the inmate staff disagree as to content, the material in question is to be submitted by the supervising editor to the warden or superintendent who will render a decision within three working days. (§ 724, subd. (b).) If the solution devised by the warden is not mutually satisfactory, the material is forwarded to the assistant director, public information, who will render a decision within three working days. (*Id.*)

Section 723 contains the guidelines for content. At the time the habeas petition was filed in superior court, the section read as follows: "Section 723. *Content.* (a) Publications will be written, illustrated and produced in accord with the highest journalistic standards. Relevancy, accuracy, objectivity, fairness and balance will be required in all articles. [¶] (b) Publications generally will not be designed to cover events and issues outside of the institution, except for matters directly related to institution or departmental operations, such as new laws or court decisions affecting inmates. Articles and news stories should be generally relevant in the context of prison operations. [¶] (c) Material which is written by persons not assigned to the staff of the publication is contributed material. *While pertinent articles may be accepted from contributors, such material should be carefully reviewed and edited so as to avoid undue promotion of special interest.* The source of all contributed material, from outside sources, inmates, and employees, must be included. [¶] (d) Reprinting of news stories and articles from other publications is discouraged, since such practice does not provide experience or training in news writing. An occasional reprint may be appropriate. The source of reprints must be noted. [¶] (e) No inflammatory material will be published which might threaten institution safety or security. Material offensive to any race, nationality, religious faith or similar group is prohibited. Lewd, obscene, pornographic, sexually suggestive, libelous or defamatory material is prohibited. *Care should be taken to avoid publication of material which might be regarded generally as in bad taste.* Use of profane or vulgar terminology is prohibited. Reports and articles will not attack any individual or serve as a vehicle for individual inmate complaints, as a substitute for the departmental inmate appeal procedure. [¶] (f) No advertising material of a commercial nature will be printed. [¶] (g) Responsible editorial comment by inmate editors and reporters may be included in institution publications. All such material will carry the by-line of the author and a short editor's note indicating that the expressed opinions are those of the author and do not necessarily represent the position of the management and staff of the institution or the department."

The superior court ordered that the portions of section 723 italicized above be modified or deleted. The revisions were made on August 11, 1983,

at which time the department also added a prohibition in section 723, subdivision (e) against material offensive to any gender.

Section 725 provides: "Section 725. *Names and Photographs.* Names and Photographs of inmates and rank and file employees will not be used without their permission. Names of management employees may be used without permission when the manager is an official source of information or comment. In the event an employee or inmate is a member of a team or organization, or for some other reason may be the frequent subject of published articles or illustrations, he or she may give a single blanket approval for subsequent publication of his or her name and picture."

Section 726 provides for the suspension and termination of publications and section 727 requires that a copy of each issue be sent to the assistant director for public information. Neither section is challenged.

At the time the habeas petition was filed in superior court, section 728 read as follows: "Section 728. *Expense and Circulation.* (a) The expense of publication will be covered as general operating expense of the institution. [¶] (b) *Subscriptions. Subscriptions outside of the institution may be accepted from individuals, agencies, or organizations engaged in activities related to prison work, or from individuals who have a particular interest in the field.* Subscription prices shall be determined with the approval of the warden or superintendent. Prices will cover only the cost of production, handling and mailing and will not be established so as to return a profit. Solicitation of subscriptions is prohibited. [¶] (c) *Exchanges.* Exchanges or free circulation shall be limited to schools, libraries, government agencies, other prisons and organizations involved in activities related to prisons. Mailing lists will expire and be reviewed by October 1 of each year. The supervising editor may approve the sending of single copies of the publication to individuals or groups who have performed a service to the institution. Lists of such mailings will be subsequently forwarded to the warden or superintendent."

The superior court ordered that the italicized sentence be modified or deleted and subdivision (b) now reads: "(b) *Subscriptions.* Subscriptions from outside individuals and organizations may be accepted. Subscription prices shall be determined with the approval of the warden or superintendent. Prices will cover only the cost of production, handling and mailing and will not be established so as to return a profit. Solicitation of subscriptions is prohibited."

The Supreme Court issued the order to show cause for consideration of whether the administrative guidelines of sections 720 through 728 conform to the standards set forth in *Bailey* v. *Loggins, supra,* 32 Cal.3d 907.

In that case, the supervising editor of the Star News, an inmate newspaper at Soledad, had rejected two articles which spoke favorably of collective organization and bargaining by the prisoners.

The Supreme Court affirmed the order of the superior court directing publication of the two articles. The court rejected the characterization of the Star News as a mere "practice" newspaper or a house organ whose content would be within the complete control of the Department of Corrections. Based on the facts, the court characterized the paper as a "limited-purpose newspaper" and turned to the question of whether such a publication enjoys any protection under the First Amendment. (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 917.) As to this question the court concluded: "First Amendment values are implicated under two traditional theories." (*Id.,* at p. 919.) First is the theory that since the inmate publication "functions as a public forum for the expression of ideas within the limited scope of the paper's purpose, the state may not infringe the right of free expression within the parameters of the forum." (*Id.,* at pp. 919-920.) Second is the theory that "in applying and enforcing regulations, the department should act in a neutral, nonarbitrary, even-handed manner." (*Id.,* at p. 220.)

Although the Supreme Court did not review the administrative regulations in *Bailey* v. *Loggins, supra,* it made several rulings and observations of relevance to the validity of the regulations. First, it overturned the portion of the superior court's order directing enactment of new regulations "which would permit censorship only of articles which could reasonably be deemed a threat to the security of the institution or which describe the making of a weapon, explosive, poison, or destructive devise. . . ." (*Id.,* at p. 922.) The court held that the department was not limited to a ban on articles which it perceived to be a threat to institutional security. "The department may also assert its authority to achieve other legitimate penological objectives, such as vocational training of the person working on the paper and the publication of news important to the inmate community. And in all such matters, the courts give deference to determinations by prison officials that retrictions are essential to protect a legitimate state interest. (*Pell* v. *Procunier, supra,* 417 U.S. 817, 827 [41 L.Ed.2d 495, 504, 94 S.Ct. 2800]; *Jones* v. *North Carolina Prisoners Union, supra,* 433 U.S. 199, 126 [53 L.Ed.2d 629, 638-639, 97 S.Ct. 2352].)" (*Id.,* at p. 922.)

Second, the *Bailey* court required that the prison authorities adhere to standards of *Procunier* v. *Martinez* (1974) 416 U.S. 396 [40 L.Ed.2d 224, 94 S.Ct. 1800] and Penal Code section 2600[1] in framing and applying any

---

[1]Penal Code section 2600 provides: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

new regulations. In *Procunier* v. *Martinez,* the court, although in different context, had before it the issue of "the appropriate standard of review for prison regulations restricting freedom of speech."[2] (*Id.,* at p. 406 [40 L.Ed.2d at p. 236].) Applying prior decisions from a variety of First Amendment contexts, the court adopted the following test: "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." (*Id.,* at p. 413 [40 L.Ed.2d at p. 240].)

 To summarize, it appears that the state may censor newspapers in order to provide for the reasonable security of the institution and the reasonable protection of the public. It may also exercise control over the content of the newspaper to serve valid penological objectives, but censorship may not go beyond that which is necessary to achieve a legitimate penological objective. (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 920.)

Against this constitutional backdrop and the edict of the Supreme Court we proceed to analyze the department regulations and guidelines for the publication of prison newspapers.

### The Role of the Supervising Editor

Section 722 of the regulations sets forth the authority and responsibility of the supervising editor as proscribed by the department. In our view the regulations may reasonably be construed as empowering the supervising editor to act as a censor but not without limitation. The Attorney General points out that statutes are to be construed if possible so as to uphold their constitutionality. This rule applies only where "ambiguous language admits of choice." (*People* v. *Vasquez* (1979) 94 Cal.App.3d 42, 48 [156 Cal.Rptr. 235].) We therefore are of the opinion that an ambiguity exists which would permit the censorship guidelines of sections 723 and 725 to be construed as limitations upon the editors authority granted under section 722(d), and thus hold that the section is not in conflict with the standards permitted by *Bailey* v. *Loggins, supra,* 32 Cal.3d 907.

### Censorship Provisions

 The subdivisions of section 723 containing the censorship guidelines will be considered as they are presently written.

---

[2]The court in *Procunier* v. *Martinez* also involved a facial challenge to regulations. Prisoners sought declaratory and injunctive relief against the enforcement of regulations relating to censorship of prisoner mail. Although the court did not prohibit all censorship, it held that the regulations in question were unconstitutional under the First Amendment, void for vagueness, and violative of the Fourteenth Amendment's guarantee of procedural due process.

"(a) Publications will be written, illustrated and produced in accord with the highest journalistic standards. Relevancy, accuracy, objectivity, fairness and balance will be required in all articles."

This subsection is viewed as a statement of journalistic objectives and as a standard obviously relevant to the achievement of the legitimate penological objective of journalistic education.

"(b) Publications generally will not be designed to cover events and issues outside of the institution, except for matters directly related to institution or departmental operations, such as new laws or court decisions affecting inmates. Articles and news stories should be generally relevant in the context of prison operations."

This paragraph defines the newspaper as one of limited purpose, a definition recognized, and approved, by the *Bailey* court. (See 32 Cal.3d at p. 917.) In fact it was under this characterization that the Supreme Court held the Star News was entitled to First Amendment protection. It appears that amicus's reservation about narrowing the focus of a prison newspaper is unjustified. Informing inmates of events in the prison and concerns to them as prisoners is a legitimate penological objective. We view this subsection of section 723 as a further statement of policy for the limited purpose publication.

"(c) Material which is written by persons not assigned to the staff of the publication is contributed material. While pertinent articles may be accepted from outside contributors, such material should be carefully reviewed and edited so as to avoid undue promotion of special interest. The source of all contributed material, from outside sources, inmates and employees, must be included."

The only challenge to this subdivision is from amicus who contends the censor is given too wide a latitude by the word "pertinent." This subsection is also not considered restrictive but permissive. The objection to the word "pertinent" appears unwarranted; its deletion would have no practical effect on the application of the subsection in view of the other regulations.

"(d) Reprinting of news stories and articles from other publications is discouraged, since such practice does not provide experience or training in news writing. An occasional reprint may be appropriate. The source of reprints must be noted."

Again the penological objective is education. It seems clear that the objective can only be achieved by requiring the inmates to do the writing. Allowing an occasional reprint permits flexibility. Once again we view this

subsection as a general statement of policy related to the "limited scope" of the publication's purpose, and not as censorship.

"(e) No inflammatory material will be published which might threaten institution safety or security. Material offensive to any race, gender, nationality, religious faith or similar group is prohibited. Lewd, obscene, pornographic, sexually suggestive, libelous or defamatory material is prohibited. Use of profane or vulgar terminology is prohibited. Reports and articles will not attack any individual or serve as a vehicle for individual inmate complaints, as a substitute for the departmental inmate appeal procedure."

The People contend that the restrictions of this section are permissible to achieve security and good journalism. The *Bailey* court held that "the department may censor newspapers in order to provide for the reasonable security of the institution and the reasonable protection of the public." (32 Cal.3d at p. 920.) Thus, restricting material, whether "inflamatory" or not, which *might* threaten institutional safety is permissible. There is no need to limit the standard to an imminent threat to security as amicus suggests.

Although a general prohibition of all material which threatens security or order is permissible, the effort to be more specific in these regulations elicits a complaint from petitioner. All materials "offensive" to several groups are prohibited. The word "offensive" is vague and subjective and we must view the prohibition as being conditioned on the threat to security and order.

Obviously obscene and pornographic material may be prohibited as it is not entitled to First Amendment protection. (*Miller* v. *California* (1973) 413 U.S. 15, 22-23 [37 L.Ed.2d 419, 430, 93 S.Ct. 2607].) However, the prohibition of material which is lewd or sexually suggestive is questionable. The People suggest in their brief that the prohibition will avoid "threats to institutional security based upon sexual assaults or provocations and is consistent with the requirement that the papers meet standards of good journalism." These are reasonable and valid penological objective and thus permitted by *Bailey*.

The superior court, as well as the People, considered the prohibition of such material and the prohibition against vulgar and profane terminology to be relevant to the objective of vocational education. The superior court also mentioned that the prohibition was needed to prevent "a newspaper from turning into a crude publication that in turn reflects on the institution and affects the moral [*sic*] of the inmates." The institution understandably may wish to achieve a newspaper of which it can be proud and this is a valid "penological" objective. More importantly, it may be noted that the prohibition is against vulgar and profane "terminology" only. A reasonable

interpretation of the phrase is that it does not restrict the use of such language as having been spoken in the reporting of a news event, but does prohibit the use of the terminology in a journalistic or editorial comment.

Preventing libelous and defamatory material from being published may be viewed as being relevant to the objective of vocational education as well as being necessary to prevent a threat to institutional safety (or to provide reasonable security for the institution and protection of the public). Certainly the prohibition on reports and articles which attack any individual is a valid exercise of the power to provide for institutional security and safety and also reasonable protection of the public. We do not view this as a prohibition upon comment or expression but upon an outright journalistic attack upon an individual.

Finally, subdivision (e) prohibits the use of articles "as a substitute for the departmental inmate appeal procedure." As limited, the restriction could be seen as necessary to a valid penological objective, the use of the administrative appeal procedure to resolve a grievance. The regulation does not appear to restrict the newspaper from printing an article about an inmate complaint which has been submitted to the administration appeal process or one not appropriate to the process. Thus, the newspaper could be an addition to the appeal procedure rather than a *substitute* for it.

There is no complaint against subdivision (f) which prohibits advertising material of a commercial nature. Subdivision (g) reads: "Responsible editorial comment by inmate editors and reporters may be included in institution publications. All such material will carry the by-line of the author and a short editor's note indicating that the expressed opinions are those of the author and do not necessarily represent the position of the management and staff of the institution or the department."

Amicus looks on the first sentence of this subdivision as permitting censorship of editorial comment by a vague and overbroad standard. The sentence, however, does not itself appear to have as its purpose the exclusion of material but its inclusion.

### Names and Photographs

Section 725 requires that, with the exception of an official source of information, names and photographs of inmates, and employees may not be used without their permission. The People are clearly correct in asserting that "the unrestricted use of the names of inmates or rank and file employees can constitute a threat to their individual safety." Petitioner believes this provision is overbroad and would have it redrafted to provide that names

and photographs can be used without permission *unless* there is substantial reason to believe that their publication will endanger the lives of the subjects or otherwise threaten institutional security. Given the fact that this is a prison, it does not appear unreasonable to take the added, and at times unnecessary, precaution of requesting permission for the publication of the name. It does not appear wholly unlikely that an inmate or staff member might be subjected to a danger unknown or unsuspected by the writers or editors of the paper.

### Removal of an Editor or Reporter

Subsection 722(d) provides that the supervising editor evaluate in writing the inmate editor's performance and that: "Consistently poor performance evaluations may be cause for removing an editor or reporter from the staff of the publication." Amicus contends that this standard is too vague and too subjective to pass muster and violates due process protections. It is concluded that amicus is incorrect. "In determining applicable due process safeguards, it must be remembered that 'due process is flexible and calls for such procedural protections as the particular situation demands.'" (*People* v. *Ramirez* (1979) 25 Cal.3d 260, 268 [158 Cal.Rptr. 316, 599 P.2d 622].) The fact that written evaluations are required means that the inmate will have notice of the complaints of the supervising editor and that removal will be reasoned. If, as the director declares in his affidavit, there is a "well-established appeal process by which complaints of individual inmates can be reviewed," the inmate will be entitled to a hearing and to relief if the announced reasons for removal have been patently arbitrary or discriminatory.

### Subscriptions

■ As a result of the superior courts action, subdivision (b) of section 728 was amended. The regulation now reads: "Subscriptions from outside individuals and organizations may be accepted." (§ 728, subd. (b).) Amicus contends that this wording allows the prison authorities total discretion as to who may subscribe. This would be an unconstitutional restriction on the speaker's right to be heard and on the recipient's right to receive information. (See *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 756 [48 L.Ed.2d 346, 354-355, S.Ct. 1817]; *Procunier* v. *Martinez, supra,* 416 U.S. at pp. 407-408 [40 L.Ed.2d at pp. 236-237].) However, the sentence is ambiguous. Is the intent to allow subscriptions or allow subscriptions to be restricted? The construction which will uphold constitutionality is to be preferred. (*People* v. *Vasquez, supra,* 94 Cal.App.3d at p. 48.) The sentence under consideration may be construed to mean that subscriptions will be accepted when sought by the intended subscriber.

The last sentence of section 728, subdivision (b), absolutely prohibits the solicitation of subscriptions. The reasons for such a prohibition are readily discernible from a reading of sections 728 and 721. The primary purpose of the publication is to disseminate relevant information of interest to inmates and staff within the institution. (§ 721.) The expense of publication is to be borne by the institution and subscription prices shall not be established so as to return a profit. (§ 728, subd. (a).) We therefore reach the conclusion that though subscriptions will be accepted, there is no legitimate purpose to be served by expending the institutions resources in order to increase the outside circulation of this nonprofit informational and training publication, through the solicitation of subscriptions.

*Conclusion*

It is concluded that the regulations conform to the standards set forth in *Bailey* for a limited scope publication which functions as a public forum. We further conclude that the department of corrections may exercise control over the newspaper as set forth in the regulations and as discussed above on the grounds that the censorship provides for the reasonable security of the institution as well as reasonable protection of the public and serves valid penological objectives. (Pen. Code, § 2600; *Bailey* v. *Loggins, supra,* 32 Cal.3d 907.)

The petition for a writ of habeas corpus is denied.

Panelli, J., concurred.

**POCHÉ, Acting P. J.,** Dissenting.—Our task in this cause is to decide whether the Department of Corrections has sustained the burden placed on it by the California Supreme Court, namely, "to show cause . . . how its administrative guidelines governing prison newspapers conform to the standards set forth in *Bailey* v. *Loggins* (1982) 32 Cal.3d [907 (187 Cal.Rptr. 575, 654 P.2d 758)]." This decision is obviously a two step process: (1) what are the "standards" set forth in *Bailey* v. *Loggins;* and (2) has the Department of Corrections sustained its burden of proving that its regulations "conform" to those standards. In my view, my majority colleagues have misinterpreted the *Bailey* standards governing prison newspapers, and the Department of Corrections has not yet shown cause—i.e., presented evidence—to show how its regulations conform to the true standards of *Bailey.*

Accordingly, I dissent.

## The First Step

*Bailey* v. *Loggins* consists of five separate opinions: (1) a lead opinion authored by Justice Broussard concurred in by Justice Reynoso; (2) a separate concurring opinion by Justice Newman; (3) a separate concurring opinion by Chief Justice Bird; (4) a dissenting opinion by Justice Richardson concurred in by Justice Mosk; and (5) a dissenting opinion by Justice Kaus.

In the lead opinion, Justices Broussard and Reynoso posit that prisoners enjoy some measure of press freedom rights under both the United States and the California Constitutions. (*Bailey* v. *Loggins, supra,* 32 Cal.3d at pp. 917-920.) The extent of this protection is not coextensive with that accorded to private, noninstitutionalized publishers. Thus, the Department of Corrections may "censor [prison] newspapers in order to provide for the reasonable security of the institution and the reasonable protection of the public. . . ." (Pen. Code, § 2600)[1], may "exercise control over the content of the newspaper to serve valid penological objectives. . . .", "can insist on standards of good journalism . . ." and "can also insist that the newspaper report announcements and events of interest to its readers." (*Bailey* v. *Loggins, supra,* at p. 920 and fn. 9.) Justices Broussard and Reynoso concluded that regulations concerning prison newspapers "must be framed and applied uniformly with due regard for constitutionally protected rights of free expression, and in accord with the standards of . . . Penal Code section 2600" and the traditional "less restrictive" means test for evaluating regulation of such rights. (*Bailey* v. *Loggins, supra,* at pp. 920-921 and fn. 10.)

The sole announced purpose of the Chief Justice's concurring opinion was to emphasize that the Department of Corrections "may not reissue regulations substantially similar to those which have been presented to this court," and that "the regulations issued hereafter must comport with the First Amendment principles applicable to state publications generally (except as provided by Pen. Code, § 2600)." (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 923 (conc. opn. of Bird, C. J.).)

---

[1]Penal Code section 2600 provides in pertinent part that "[a] person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." As Justice Broussard in his lead opinion puts it: "Thus by statute California prisoners retain all rights encompassed under the heading of freedom of the press in the First Amendment to the United States Constitution and article I, section 2 of the California Constitution, except to the extent that such rights must be curtailed for institutional security and public safety." (*Bailey* v. *Loggins, supra,* at p. 915.)

Unless otherwise indicated, all further statutory references are to the Penal Code.

Thus at least three members of the court agree that the regulations governing prison newspapers "must comport with the First Amendment principles applicable to state publications generally (except as provided by Pen. Code, § 2600)." But the agreement of three justices of a seven-member tribunal is not sufficient to establish "standards."

As I read the concurring opinion of Justice Newman, it supplies sufficient agreement with a portion of the language or the lead opinion (when read in conjunction with the concurring opinion of the Chief Justice) so that it can be said, with some assurance, that there are "standards set forth in *Bailey* v. *Loggins.*" In other words, a majority of the court agrees on a rationale.

Justice Newman does not rely on the federal Constitution, but solely on the California Constitution, and in so doing agrees with the lead opinion to the extent that section 2 of article I of the California Constitution is applicable. (See *Bailey* v. *Loggins, supra,* at p. 923 (conc. opn. of Newman, J.).)[2] Thus the "standards" of *Bailey* v. *Loggins* to the extent they are of constitutional origin, are limited to the California Constitution and only to section 2 of article I thereof.[3]

Justice Newman steps away from a portion of the lead opinion's rationale. He does "not agree that Penal Code section 2600 permits any restraints or abridgements of speech, press, and petition rights that can be justified only by referring to 'good' journalistic standards or 'valid' penological objectives." (*Bailey* v. *Loggins, supra,* at p. 923 (conc. opn. of Newman, J.).) Instead, in his view the Legislature in section 2600 has required that those standards and objectives which justify restraints or abridgements of speech, press and petition rights "be based on either security or public protection." He reads the lead opinion as holding that "except when necessary to provide for reasonable security or reasonable public protection, the Department of Corrections no longer may concretize clauses like those of regulation 723 that are identified in footnote 10 of the opinion." Only on the basis of such an interpretation of the holding of the lead opinion does he concur. (*Ibid.*)

When these three opinions representing the views of the four justices who comprised a majority of the court are distilled for the purpose of determining what rationale is shared, it is, without doubt, that no restraints or abridgements of the free speech and free press rights enunciated in section

---

[2]Justice Newman also finds section 3 of article I applicable, but the majority makes no reference to that provision of the California Constitution. (See *Bailey* v. *Loggins, supra,* at p. 915; contrast, *id.,* at p. 923 (conc. opn. of Newman, J.).)

[3]Section 2 of article I of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

2, article I of the California Constitution are allowed in a prison newspaper context except to the extent that the Department of Corrections can demonstrate that such restraint or abridgement is "necessary in order to provide for the reasonable security of the institution . . . and for the reasonable protection of the public." (§ 2600.)

In other words, "the standards set forth in *Bailey* v. *Loggins*" are that administrative guidelines governing prison newspapers must comport: (1) with state constitutional principles applicable to state publications generally (i.e., Cal. Const., art. I, § 2) and (2) that no restraint or abridgement of such rights as measured in a nonprison context is allowed unless the restraint or abridgement is proved to be *necessary* for either the reasonable security of the institution or the reasonable protection of the public. (§ 2600.)

My majority colleagues, apparently relying on some of the language of Justice Broussard's lead opinion, find that the state may censor prison newspapers so long as the censorship is necessary to achieve a "legitimate penological objective." (Majority opn., *ante,* at p. 608.) Justice Newman, the fourth vote necessary to the judgment, explicitly rejects such a notion. For example he explains ". . . I do not agree that Penal Code section 2600 permits any restraints or abridgements of speech, press, and petition rights that can be justified only by referring to . . . 'valid' penological objectives. In my view the Legislature has required that those standards and objectives be based on either security or public protection." (32 Cal.3d at p. 923.) Similarly the Chief Justice explains that she believes the lead opinion "makes clear" that "the regulations issued hereafter must comport with the First Amendment principles applicable to state publications generally (except as provided by Penal Code, § 2600)." Since neither such principles nor section 2600 allows restraints for penological objectives and neither Justice Newman nor Chief Justice Bird agree with the language relied upon by my majority colleagues the result is that such language is not part of the holding or of the "standards set forth" in *Bailey* v. *Loggins.*[4]

---

[4]Justices Richardson, Mosk, and Kaus dissented in *Bailey.* Justice Richardson began his dissent from the premise that "inmates have neither a constitutional nor statutory right to publish their articles in such a newspaper." (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 923 (dis. opn. of Richardson, J.).) He felt that "[g]iven the highly volatile and unpredictable environment existing behind prison walls, . . . the scope of discretion vested in prison officials must include the right to edit or refuse to publish *any* articles which prison officials in the fair exercise of their professional judgment reasonably deem potentially disruptive, provocative or inflammatory. . . ." (*Id.,* at p. 926, italics in original.) He and Justice Mosk therefore concluded that the Department of Corrections "acted properly both in vesting prison officials with ultimate control over the content of inmate's articles, and in promulgating the regulations at issue." (*Id.,* at p. 924.) Justice Kaus also criticized the "majority" for "start[ing] from an erroneous premise," namely, that the inmate publication implicated constitutional rights. (*Id.,* at p. 928 (dis. opn. of Kaus, J.).) For him, "the type of prison newspaper permitted by the department is *sui generis* and simply will not fit into the standard

## The Second Step

The second step is to determine whether the Department of Corrections has sustained its burden in this proceeding of showing how its administrative regulations conform to these standards. So far, it has not.

There is at present no factual basis upon which this court can determine: (1) whether the regulations are in fact *necessary* for the reasonable security of the institution, or the reasonable protection of the public (§ 2600; see *Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 920); or (2) if the regulations are necessary, whether there are less restrictive alternatives by which the regulatory object could be achieved. No evidence on either of these matters has been presented by the parties. In my view, until this is done, my majority colleagues are premature in their determination of the validity or invalidity of the regulations challenged here. Accordingly, instead of reaching the merits of the petition in this factual vacuum, I would appoint the superior court to sit as a referee and set the matter for an evidentiary hearing and then review the findings of the referee prior to ruling on the merits of the petition.

Petitioner's application for a hearing by the Supreme Court was denied December 20, 1984. Reynoso, J., and Grodin, J., were of the opinion that the application should be granted.

---

First Amendment mold." (*Id.,* at p. 930, italics in original.)

It is apparent from this brief examination of the dissenting opinions that three justices refused to concede the validity of the initial point of analysis from which the majority proceeded. The consequence of this fundamental and irreconcilable divergence is that the dissenters never reached the merits of underlying issue of regulation decided by the majority. It is therefore futile, in my view, to consider the dissenting opinions to determine "the standards set forth in *Bailey* v. *Loggins.* "