[No. A025314. First Dist., Div. Three. Jan. 30, 1987.]

VICTOR G. DIAZ et al., Plaintiffs and Appellants, v.
HAL WATTS, as Acting Superintendent, etc., et al., Defendants and
Respondents.

COUNSEL

William J. Taylor, Peter P. Goodman, Brian F. Berger, Brobeck, Phleger & Harrison, Margaret C. Crosby, Donna J. Hitchens, Alan L. Schlosser and Amitai Schwartz for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Kristofer Jorstad and Dane R. Gillette, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**BARRY-DEAL, J.**—The issue before us is the validity of current regulations promulgated by the California Department of Corrections (Department) on the publication of prison newspapers.

Appellants are Victor Diaz and Eric Martin, former inmates at the California Medical Facility at Vacaville (CMF) and editors of the Vacavalley Star (the Star); the Prisoners' Union, an outside subscriber to the Star; and Debra Rice, a taxpayer. They brought a series of actions against the superintendent of CMF, the director of the Department, and others, culminating with this one seeking declaratory relief and a permanent injunction against enforcement of the regulations. On appeal from the order denying a preliminary injunction (Code Civ. Proc., § 904.1, subd. (f); 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 98, p. 117), they contend that the regulations in question are inconsistent with the California Supreme Court's decision in *Bailey* v. *Loggins* (1982) 32 Cal.3d 907 [187 Cal.Rptr. 575, 654 P.2d 758] (hereafter *Bailey*), interpreting Penal Code section 2600,[1] the First Amendment of the

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

United States Constitution, *Procunier* v. *Martinez* (1974) 416 U.S. 396 [40 L.Ed.2d 224, 94 S.Ct. 1800], and article I, section 2 of the California Constitution. Specifically, they claim that the majority of the regulations are overbroad, vague, and susceptible to official abuse and arbitrary and personal application. They also contend that the regulations must be enjoined in their entirety because they are a comprehensive, coordinated set with no severability clause.

We disagree with appellants' narrow reading of *Bailey* and uphold the regulations as being within the Department's power to limit the exercise of prisoners' rights for purposes of prison security, protection of the public, and valid penological objectives. Accordingly, we affirm the order denying preliminary injunction.

*Background*

This appeal is the latest chapter in a series of disputes over prison newspapers that began at least a decade ago. The *Bailey* decision had its origins in 1976, when two articles written by a Soledad inmate for that prison's newspaper were rejected. The author pursued grievance procedures and asked that guidelines governing newspaper content be established. (*Bailey, supra,* 32 Cal.3d at p. 911.) The Department complied with the latter request, but then rejected the articles under the newly established regulations. (*Id.,* at pp. 911-912.)

Those regulations, as read by the *Bailey* court, "provided generally that the newspaper should conform to good journalistic standards, be designed to appeal to all inmates, and avoid material offensive to racial, religious, or political groups. . . . [T]he guidelines prohibited the use of the newspaper to attack administration rules or policy, or to assert any grievance. They also banned the assumption of an editorial position on pending legislation, the attempt to elect or defeat any official, or an attack upon existing governmental policy." (*Id.,* at p. 912.)

Bailey, as editor of the paper, and others, brought a mandamus action seeking to compel publication of the two articles, the establishment of narrower regulations, and the establishment of an expeditious review procedure. (*Id.,* at pp. 910, 912.) During trial the Department published new and more complete regulations which incorporated the former provisions without change. (*Id.,* at p. 912.) The trial court issued the writ, finding the regulations overbroad and the appeal procedure inadequate. (*Id.,* at pp. 913-914.)

Pending appeal and review in the appellate courts, the Department changed its regulations twice more, ultimately returning to ones similar to

those in effect at the time of trial. Meanwhile the Department withdrew its objections to publication of the two articles, but controversy remained regarding validity of the regulations. (*Id.,* at p. 914.) The Supreme Court affirmed the trial court's order mandating enactment of new regulations and requiring that a speedy method of review be established. It reversed that portion of the order directing enactment of regulations which would permit prison authorities to exercise only a very limited censorship. (*Bailey, supra,* 32 Cal.3d at p. 922.)

Not long after *Bailey* was decided, Charles (EZ) Williams, editor of the San Quentin News, initiated a habeas corpus proceeding in Marin County alleging that the departmental guidelines issued on January 13, 1983, in response to *Bailey* were constitutionally invalid on their face. (*In re Williams* (1984) 159 Cal.App.3d 600, 602-603 [205 Cal.Rptr. 903] [hereafter *Williams*].) The superior court ordered three provisions modified or deleted and rejected Williams's numerous other attacks. The Department revised the regulations on August 11, 1983, to comply with the Marin County Superior Court order. When the Court of Appeal denied a writ petition challenging the revised regulations, the Supreme Court issued an order to show cause returnable before the Court of Appeal, directing the Department to show how its revised guidelines conformed to the standards set forth in *Bailey*. (*Williams, supra,* at pp. 603-605.) Division Four of this court concluded that the Department met that burden and denied the writ, over a dissent by Acting Presiding Justice Poché. The Supreme Court denied hearing. (*Id.,* at pp. 612, 616.)

The controversy underlying the action in the case at bench, which was filed in March 1981, grew out of censorship disputes beginning in 1980. It has been taken to the Solano County Superior Court on several occasions. The regulations upheld in *Williams,* i.e., the January 1983 regulations as revised, are also the subject of this appeal, having been upheld by the trial court.

### Discussion

The traditional approach, which considered prisoners to be "civilly dead," has been reversed in the last two decades by statutory enactment and judicial interpretation. (See generally, 2 Witkin, Cal. Crimes (1985 supp.) Punishment for Crime, § 917, pp. 322-326; Comment, *Constitutional Rights in Prison: The Standard of Review in California* (1985) 16 Pacific L.J. 1077.) Section 2600 now provides: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he [or she] is confined and for the reasonable protection of the public."

It was in light of this provision, and those of the United States and California Constitutions, that the Supreme Court was called upon to assess the Department's regulations in *Bailey*. And it was in light of the *Bailey* decision that Division Four of this court in *Williams* was required to determine the validity of the revised regulations before it and before us now.

The *Williams* majority (Haugner, J.,* with Panelli, J., conc.) characterized the *Bailey* holdings as follows: ". . . the state may censor newspapers in order to provide for the reasonable security of the institution and the reasonable protection of the public. It may also exercise control over the content of the newspaper to serve valid penological objectives, but censorship may not go beyond that which is necessary to achieve a legitimate penological objective. [Citation.]" (*Williams, supra,* 159 Cal.App.3d at p. 607.) The majority tested the regulations against this standard and concluded: ". . . the regulations conform to the standards set forth in *Bailey* for a limited scope publication which functions as a public forum. . . . [T]he department of corrections may exercise control over the newspaper as set forth in the regulations and as discussed above on the grounds that the censorship provides for the reasonable security of the institution as well as reasonable protection of the public and serves valid penological objectives. [Citations.]" (*Id.,* at p. 612.)

Justice Poché dissented, stating that the majority, which did not address his point, had analyzed the *Bailey* holding incorrectly. Although we do not adopt Justice Poché's view in its entirety, and ultimately we agree with the result reached by the *Williams* majority, the diversity of opinions in *Bailey* has led to confusion (see Comment, *First Amendment Rights of Prisoners: Freedom of the Prison Press* (1984) 18 U.S.F. L.Rev. 599), on which Justice Poché's opinion sheds some light. Accordingly, we set out a portion of Justice Poché's dissent, with appropriate additions and deletions as indicated.

"*Bailey* v. *Loggins* consists of five separate opinions: (1) a lead opinion authored by Justice Broussard concurred in by Justice Reynoso; (2) a separate concurring opinion by Justice Newman; (3) a separate concurring opinion by Chief Justice Bird; (4) a dissenting opinion by Justice Richardson concurred in by Justice Mosk; and (5) a dissenting opinion by Justice Kaus.

"In the lead opinion, Justices Broussard and Reynoso posit that prisoners enjoy some measure of press freedom rights under both the United States and the California Constitutions. (*Bailey* v. *Loggins, supra,* 32 Cal.3d at pp. 917-920.[2]) The extent of this protection is not coextensive with that

---

*Assigned by the Chairperson of the Judicial Council.

[2]The Supreme Court defined one of the issues before it as "whether a prison newspaper intended to serve and serving as a limited forum for prisoner expression enjoys any protection under the First Amendment or correlative California provisions." (*Bailey, supra,* 32 Cal.3d at p. 917.) Thereafter it refers only to "First Amendment" when discussing the issue.

accorded to private, noninstitutionalized publishers. Thus, the Department of Corrections may 'censor [prison][3] newspapers in order to provide for the reasonable security of the institution and the reasonable protection of the public. . . .' (Pen. Code, § 2600)[4], may 'exercise control over the content of the newspaper to serve valid penological objectives [citing federal decisions]. . . .', 'can insist on standards of good journalism . . .' and 'can also insist that the newspaper report announcements and events of interest to its readers.' (*Bailey* v. *Loggins, supra;* at p. 920 and fn. 9.) Justices Broussard and Reynoso concluded that regulations concerning prison newspapers 'must be framed and applied uniformly with due regard for constitutionally protected rights of free expression, and in accord with the standards of . . . Penal Code section 2600' and the traditional 'less restrictive' means test for evaluating regulation of such rights. (*Bailey* v. *Loggins, supra,* at pp. 920-921 and fn. 10.)

"The sole announced purpose of the Chief Justice's concurring opinion was to emphasize that the Department of Corrections 'may not reissue regulations substantially similar to those which have been presented to this court,' and that 'the regulations issued hereafter must comport with the First Amendment principles applicable to state publications generally (except as provided by Pen. Code, § 2600).' (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 923 (conc. opn. of Bird, C. J.).)

"Thus at least three members of the court [appear to] agree that the regulations governing prison newspapers 'must comport with the First Amendment principles applicable to state publications generally (except as provided by Pen. Code, § 2600).' But the agreement of three justices of a seven-member tribunal is not sufficient to establish 'standards.'[5]

"As [we] read the concurring opinion of Justice Newman, it supplies sufficient agreement with a portion of the language [of] the lead opinion (when read in conjunction with the concurring opinion of the Chief Justice) so that it can be said, with some assurance, that there are 'standards set forth in *Bailey* v. *Loggins.*' In other words, a majority of the court agrees on a rationale.

---

[3]Justice Poché's brackets.

[4]In a footnote at this point, Justice Poché states, in pertinent part: ". . . As Justice Broussard in his lead opinion puts it: 'Thus by statute California prisoners retain all rights encompassed under the heading of freedom of the press in the First Amendment to the United States Constitution and article I, section 2 of the California Constitution, except to the extent that such rights must be curtailed for institutional security and public safety.' (*Bailey* v. *Loggins, supra,* at p. 915.) . . . ."

[5]See 9 Witkin, California Procedure, Appeal, *supra,* section 808, pages 787-788 ("No opinion has any value as a precedent on points as to which there is no agreement of a majority of the court. [Citations.]").

"Justice Newman does not rely on the federal Constitution, but solely on the California Constitution, and in so doing agrees with the lead opinion to the extent that section 2 of article I of the California Constitution is applicable. (See *Bailey* v. *Loggins, supra,* at p. 923 (conc. opn. of Newman, J.).)[6] Thus the 'standards' of *Bailey* v. *Loggins* to the extent they are of constitutional origin, are limited to the California Constitution and only to section 2 of article I thereof.[7]

"[Although he concurs in the judgment,] Justice Newman steps away from a portion of the lead opinion's rationale. He does 'not agree that Penal Code section 2600 permits any restraints or abridgements of speech, press, and petition rights that can be justified only by referring to "good" journalistic standards or "valid" penological objectives.' (*Bailey* v. *Loggins, supra,* at p. 923 (conc. opn. of Newman, J.).) Instead, in his view the Legislature in section 2600 has required that those standards and objectives which justify restraints or abridgements of speech, press and petition rights 'be based on either security or public protection.' He [states that he] reads the lead opinion as holding that 'except when necessary to provide for reasonable security or reasonable public protection, the Department of Corrections no longer may concretize clauses like those of regulation 723 that are identified in footnote 10 of the opinion.' [Arguably, o]nly on the basis of such an interpretation of the holding of the lead opinion does he concur. (*Ibid.*)" (*Williams, supra,* 159 Cal.App.3d at pp. 613-614 (dis. opn. of Poché, Acting P. J.).)

This ends the portion of Justice Poché's dissent.

From this analysis, Justice Poché concludes that a "majority" in *Bailey* permits restraints on freedom of press only where necessary for prison security and public safety, and not for valid penological objectives. He therefore disagrees with the *Williams* majority, which upholds regulations based on the latter criterion. (*Williams, supra,* 159 Cal.App.3d at p. 615 (dis. opn. of Poché, Acting P. J.).) In our view, however, Justice Newman's comments place him in a minority of one, and we must look elsewhere to find the true "majority" in *Bailey,* namely, to the dissents.

Justice Richardson, with whom Justice Mosk concurred, began his dissent with the proposition that "inmates have neither a constitutional nor statu-

---

[6]In a footnote at this point, Justice Poché states: "Justice Newman also finds section 3 of article I [right to assemble and petition] applicable, but the majority makes no reference to that provision of the California Constitution. (See *Bailey* v. *Loggins, supra,* at p. 915; contrast, *id.,* at p. 923 (conc. opn. of Newman, J.).)"

[7]In a footnote at this point, Justice Poché states: "Section 2 of article I of the California Constitution provides: 'Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.' "

tory right to publish their articles in [a prison] newspaper . . ." and that therefore prison authorities must be given broad discretion to select and edit articles. (*Bailey, supra,* 32 Cal.3d at p. 923 (dis. opn. of Richardson, J.).) He questioned the lead opinion's reliance on cases holding that once a governmental entity establishes a "public forum," it cannot selectively ban expressions of which it disapproves. To demonstrate the flaw in this argument, Justice Richardson quoted the United States Supreme Court's statement that a " 'prison is most emphatically not a "public forum" ' (*Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119, 136 [53 L.Ed.2d 629, 645, 97 S.Ct. 2532]) . . . ." (*Bailey, supra,* 32 Cal.3d at p. 924 (dis. opn. of Richardson, J.).) He argued further that section 2600 was intended to preserve preexisting rights, not to create new ones. "It bears emphasis that prior to their confinement, inmates as law-abiding private citizens enjoyed no right of publication on demand, or freedom from editorial censorship. . . . I cannot fairly conclude that a person's constitutional rights are *enlarged* by the sole fact of his [or her] felony conviction or confinement in prison." (*Bailey, supra,* at p. 926 (dis. opn. of Richardson, J.), original italics.)

Justice Richardson concluded: "A prison newspaper may serve many valid and diverse purposes such as educating inmates, promoting prison morale, encouraging rehabilitation, lessening tensions, improving inmate-guard relations, recognizing literary merit, and providing a balanced reading diet. But the determination of the goals to be served and the means for implementing them is a matter which should be entrusted to the sound discretion of the prison administrators." (*Bailey, supra,* 32 Cal.3d at p. 927 (dis. opn. of Richardson, J.).)

Justice Kaus wrote a dissent with a different focus, but agreed with Justices Richardson and Mosk that the lead opinion's premise finding the paper in question a public forum was incorrect. The thrust of his opinion was that the lead writers were in effect attempting to tell prison officials what kind of newspaper they were to permit and then to tell them they were not doing it right. (*Bailey, supra,* 32 Cal.3d at pp. 928, 929 (dis. opn. of Kaus, J.).) Instead, he said, the regulations permitted the establishment of a "house organ," which everyone agreed was subject to control by prison authorities and which was "a pedagogical effort to which the First Amendment is as relevant as the Clayton Act to a game of Monopoly." (*Bailey, supra,* at p. 930 (dis. opn. of Kaus, J.).)

Thus, three justices (Richardson, J., Mosk, J., and Kaus, J.) support the broadest possible discretion in prison authorities to control and censor the content of a prison newspaper, and at least two others (Broussard, J., and Reynoso, J.) support the next broadest view, permitting control and censorship based on the needs for prison security, public safety, and penological

objectives. There can be no doubt which view the "dissenters" would follow, given the choice between that of the lead opinion and that of Justice Newman (which would permit only those limitations based on prison security and public safety). Therefore, in our view, at least five justices interpret the constitutional and statutory law as permitting broad discretionary control and censorship of prison newspapers by prison authorities based on their perceived need for prison security, public safety, and valid penological purposes.

We note that the critics of the "valid penological objectives" justification for censorship have failed to consider the meaning of the term. ■ "Penology," the root of the word "penological," is a branch of criminology dealing with prison management and treatment of offenders, especially with regard to their rehabilitation. (Webster's New Internat. Dict. (3d ed. 1970) p. 1671.) A major purpose of rehabilitation is protection of the public. (*Pell* v. *Procunier* (1974) 417 U.S. 817, 823 ["[S]ince most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody."].) Therefore, *Bailey* and the many decisions which have permitted censorship for "valid penological objectives" have in effect simply been stating in another way that censorship is permissible to protect the public safety.

Similarly, a prisoner who is rehabilitated will be less likely than others to be a discipline problem while he or she remains incarcerated. It follows that censorship for "penological objectives" is, in effect, censorship for prison security, and that permitting it is not inconsistent with the provisions of section 2600. (See generally, *Procunier* v. *Martinez, supra,* 416 U.S. 396; *Pell* v. *Procunier, supra,* 417 U.S. at pp. 822-823 [41 L.Ed.2d at pp. 501-502]; *Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119, 125, 129, 134 [53 L.Ed.2d 629, 638, 640-641, 644, 97 S.Ct. 2532]; *Pittman* v. *Hutto* (4th Cir. 1979) 594 F.2d 407, 410-411; but see Comment, *First Amendment Rights of Prisoners: Freedom of the Prison Press, supra,* 18 U.S.F. L.Rev. 599.)

■ We turn to the appropriate disposition of the case at bench, the question before us being one of law—whether the regulations in question are valid in light of the Supreme Court's decision in *Bailey*. (See *Eastern Columbia, Inc.* v. *Waldman* (1947) 30 Cal.2d 268, 273 [181 P.2d 865]; *Williams, supra,* 159 Cal.App.3d at p. 607.) We must stress that the question is one which we cannot and should not attempt to resolve from an ivory tower. ■ "Because the realities of running a penal institution are complex and difficult, [the courts] have ... recognized the wide-ranging deference to be accorded the decisions of prison administrators." (*Jones* v. *North Carolina Prisoners' Union, supra,* 433 U.S. at p. 126 [53 L.Ed.2d at

pp. 638-639].) Judges are not expert in the manner in which the inmate population might react to various printed stimuli. "[I]n all such matters, the courts give deference to determinations by prison officials that restrictions are essential to protect a legitimate state interest. [Citations.]" (*Bailey, supra,* 32 Cal.3d at p. 922.)

*The Regulations*[8]

Appellants attack every aspect of the regulations (§§ 720-728 of the administrative manual of the Department), from section 721 stating the purposes of prison newspapers to section 728 dealing with subscriptions and circulation. They aptly describe section 723, subdivision (e), of the regulations as being the "Key Censorship Provision." It provides: "(e) No inflammatory material will be published which might threaten institution safety or security. Material offensive to any race, gender, nationality, religious faith or similar group is prohibited. Lewd, obscene, pornographic, sexually suggestive, libelous or defamatory material is prohibited. Use of profane or vulgar terminology is prohibited. Reports and articles will not attack any individual or serve as a vehicle for individual inmate complaints, as a substitute for the departmental inmate appeal procedure."

Appellants cite *Procunier* v. *Martinez, supra,* 416 U.S. at page 415 [40 L.Ed.2d at p. 241], as explicitly rejecting censorship standards using the words "inflammatory" or "defamatory." Although the lead opinion in *Bailey* cited that case with approval (*Bailey, supra,* 32 Cal.3d at p. 920), limitation of material which, because of its inflammatory nature, might threaten prison security is well within the *Bailey* holding. Use of the word "offensive" standing alone might arguably be vague, but in this context it means offensive in a manner as to disrupt intergroup peace and thereby threaten prison security. (*Williams, supra,* 159 Cal.App.3d at p. 609.)

Appellants argue that the terms "vulgar" and "attack" provide the censor with an opportunity to vent personal prejudices, but we find these standards in keeping with valid penological objectives, including training and education in appropriate journalistic standards and techniques. The same is true of the mandate of section 723, subdivision (a), that publications be produced in accord with the "highest journalistic standards." (*Williams, supra,* 159 Cal.App.3d at p. 608.)

Appellants characterize section 723, subdivision (b), as a frontal attack on *Bailey.* On the contrary, it "defines the newspaper as one of limited purpose, a definition recognized, and approved, by the *Bailey* court. (See

---

[8]We set out the regulations in question in an appendix to this opinion.

[*Bailey, supra,*] 32 Cal.3d at p. 917.)" (*Williams, supra,* 159 Cal.App.3d at p. 608.)

Appellants attack the regulations seriatim, complaining that each is overbroad, vague, standardless, or in violation of *Bailey*. These same or essentially similar arguments were all rejected by the *Williams* majority, with which we agree, and no useful purpose would be served by iterating that court's opinion further. (See *Williams, supra,* 159 Cal.App.3d at p. 610 [§ 723, subds. (f), (g)], pp. 610-611 [§ 725], pp. 603-604, 607 [§ 722], pp. 611-612 [§ 728].)

## Conclusion

In his concurring opinion in *Jones* v. *North Carolina Prisoners' Union, supra,* 433 U.S. at page 137 [53 L.Ed.2d at p. 648], Chief Justice Burger made the following observations. "The solutions to problems arising within correctional institutions will never be simple or easy. Prisons, by definition, are closed societies populated by individuals who have demonstrated their inability, or refusal, to conform their conduct to the norms demanded by a civilized society. Of necessity, rules far different from those imposed on society at large must prevail within prison walls. The . . . courts . . . are not equipped by experience or otherwise to 'second guess' the decisions of state legislatures and administrators in this sensitive area except in the most extraordinary circumstances. This . . . does not imply that a prisoner is stripped of all constitutional protection as he [or she] passes through the prison's gates. . . . Rather, it 'reflects no more than a healthy sense of realism' on our part to understand that needed reforms in the area of prison administration must come, not from the . . . courts, but from those with the most expertise in this field—prison administrators themselves. [Citation.]"

The regulations under consideration constitute a reasonable attempt on the part of the Department to implement a prison newspaper program to enhance the rehabilitation of inmates through training and education which may offer them hope, but at least will occupy their time in a constructive manner—clearly a valid penological objective which will contribute to both the security of the institution and the protection of society.

The judgment is affirmed.

Merrill, J., concurred.

White, P. J., concurred in the judgment.

APPENDIX

| California Department of Corrections<br>ADMINISTRATIVE MANUAL | Chapter      700<br>Publications |
|---|---|
| | Subject   Institution Publications<br>Article 3 |

Article 3 - Institution Publications

Section 720. <u>Policy</u>. (a) Institutions may publish a newspaper, newsletter or magazine with the specific authorization of the warden or superintendent.

(b) Inmates may participate in the publication of such newspapers, magazines, or newletters with specific authorization of the warden or superintendent.

(c) Institutional publications shall be produced as part of the work, training or education program of the institution.

Sec. 721. <u>Purposes</u>. Each publication shall serve these purposes:

REV.
from
AM/149
6-17-81

(a) As a primary purpose, the publication shall provide a useful and constructive service in institution operations by disseminating relevant information of interest to inmates and staff about institutional events and activities, policies and procedures, law changes, and court decisions, plus other pertinent and useful information.

(b) It shall provide work experience and training in journalism, printing and related fields.

Sec. 722. <u>Supervision of Inmate Staff</u>.
(a) Supervision of inmates preparing an institution publication shall be the responsibility of an instructor in journalism or other qualified employee who will be designated by the warden or superintendent as supervising editor. <u>The designated supervising employee will participate in the planning and editing of each issue. The production of a satisfactory publication will require the continuing attention and effort of the designated supervising editor.</u>

(b) Volunteer Assistance and Instruction. Institutions will also endeavor to obtain assistance and advice for the inmate staff of the institution publication from a citizen journalist such as an instructor in journalism at a nearby college or university or a reporter

3-700.1

| California Department of Corrections ADMINISTRATIVE MANUAL | Chapter 700 Publications Subject Institution Publications Article 3 |
|---|---|

Sec. 722 continued

or editor from a local newspaper. Inmate reporters and editors will be provided with journalism textbooks and other instructional material and where possible they will be offered basic instruction in journalistic ethics and news writing.

(c) Selection of Inmate Staff. The designated supervising editor shall be responsible for the selection of an inmate editor and reporters for the institution publication. Selections will be made from among interested inmates who possess writing skills and an understanding of basic journalistic ethics. Inmates selected for positions on the staff of institution publications must have demonstrated by prior job performance and behavior a sense of responsibility and personal maturity.

REV.
from
AM/149
6-17-81

(d) Responsibility for Content. The designated supervising editor will be responsible for the content of the institution publication. The supervising editor will have authority, as in the case of editors for outside publications, to select, edit, or reject articles, illustrations and layouts. The supervising editor will work with the inmate editor, on a regular and continuing basis, to assure that journalistic standards of relevancy, accuracy, objectivity, fairness, and balance are maintained. The supervising editor will regularly evaluate in writing the performance of the inmate editor and reporters. Consistently poor performance evaluations may be cause for removing an editor or reporter from the staff of the publication.

(e) Time Keeping. The designated supervising editor will be responsible for recording the work time of the inmate editor and reporters for purposes of both pay and work time sentence credit awards.

Sec. 723. Content. (a) Publications will be written, illustrated and produced in accord with the highest journalistic standards. Relevancy, accuracy, objectivity, fairness and balance will be required in all articles.

3-700.2

| California Department of Corrections ADMINISTRATIVE MANUAL | Chapter: 700 Publications Subject Institution Publications Article 3 |
|---|---|

Sec. 723 continued

     (b)  Publications generally will not be designed to cover events and issues outside of the institution, except for matters directly related to institution or departmental operations, such as new laws or court decisions affecting inmates.  Articles and news stories should be generally relevant in the context of prison operations.

     (c)  Material which is written by persons not assigned to the staff of the publication is contributed material.  Pertinent articles may be accepted from outside contributors.  The source of all contributed material, from outside sources, inmates, and employees, must be included.

     (d)  Reprinting of news stories and articles from other publications is discouraged, since such practice does not provide experience or training in news writing.  An occasional reprint may be appropriate.  The source of reprints must be noted.

     (e)  No inflammatory material will be published which might threaten institution safety or security. Material offensive to any race, gender, nationality, religious faith or similar group is prohibited.  Lewd, obscene, pornographic, sexually suggestive, libelous or defamatory material is prohibited.  Use of profane or vulgar terminology is prohibited.  Reports and articles will not attack any individual or serve as a vehicle for individual inmate complaints, as a substitute for the departmental inmate appeal procedure.

     (f)  No advertising material of a commercial nature will be printed.

     (g) .Responsible editorial comment by inmate editors and reporters may be included in institution publications.  All such material will carry the by-line of the author and a short editor's note indicating that the expressed opinions are those of the author and do not necessarily represent the position of the management and staff of the institution or the department.

3-700.3

AM/229 (8-11-83)

| California Department of Corrections | Chapter: 700 Publications |
|---|---|
| ADMINISTRATIVE MANUAL | Subject Institution Publications Article 3 |

Sec. 724. <u>Editing Disagreements</u>. (a) From time to time disagreements may occur between the supervising editor and the inmate staff regarding the style, language, content, or layout of a particular article or edition. Every effort should be made to resolve such disagreements, relying on basic journalistic standards of relevancy, accuracy, objectivity, fairness and balance. The volatility of the prison environment should be considered in evaluating sensitive material. The responsibility for content rests with the designated supervising editor.

(b) When a disagreement on content cannot be resolved, a special editing/appeal process will be used. If the issue cannot be resolved by the supervising editor and the inmate editor, the material in question will be submitted by the supervising editor to the warden or superintendent who will render a decision, which may include reasonable editorial changes, within three working days. If a mutually satisfactory solution cannot be arrived at, the material will be forwarded by the warden or superintendent via telecopier to the assistant director, public information. The assistant director will render a decision within three working days following receipt of the questioned material. The assistant director may require editing of material to conform with journalistic standards of relevancy, accuracy, objectivity, and balance.

Sec. 725. <u>Names and Photographs</u>. Names and photographs of inmates and rank and file employees will not be used without their permission. Names of management employees may be used without permission when the manager is an official source of information or comment. In the event an employee or inmate is a member of a team or organization, or for some other reason may be the frequent subject of published articles or illustrations, he or she may give a single blanket approval for subsequent publication of his or her name and picture.

Sec. 726. <u>Suspension and Termination</u>. Institution publications may be temporarily suspended during lockdowns and other emergencies with the approval of the warden or superintendent. Publications may be terminated only with the approval of the director.

672

Sec. 727. _Director's File Copy._ A copy of each issue of each publication shall be sent to the assistant director for public information.

Sec. 728. _Expense and Circulation._ (a) The expense of publication will be covered as general operating expense of the institution.

(b) Subscriptions. Subscriptions from outside individuals and organizations may be accepted. Subscription prices shall be determined with the approval of the warden or superintendent. Prices will cover only the cost of production, handling and mailing and will not be established so as to return a profit. Solicitation of subscriptions is prohibited.

(c) Exchanges. Exchanges or free circulation shall be limited to schools, libraries, government agencies, other prisons and organizations involved in activities related to prisons. Mailing lists will expire and be reviewed by October 1 of each year. The supervising editor may approve the sending of single copies of the publication to individuals or groups who have performed a service to the institution. Lists of such mailings will be subsequently forwarded to the warden or superintendent.

3-700.5